## WEBB v. LAFAYETTE COUNTY.

1. **Township Railroad Aid Act :** TWO-THIRDS OF THE VOTERS. The act of 1868, to facilitate the construction of railroads (Acts 1868, p. 92,) is unconstitutional and void, because it permits a subscription to be made by a township to the stock of a railroad company, if two-thirds of the qualified voters who vote on the question at an election are in favor of it, whereas the constitution of 1865 required the assent of two-thirds of all the qualified voters to authorize any municipal subscription.

2. ———: DIVERSION OF STATE AND COUNTY REVENUE: LAW UNCONSTITUTIONAL IN PART. This act is also unconstitutional, because section 5 of the act devotes all the State and county taxes to be collected within any township from any railroad company to which the township has subscribed, to the reimbursement of the township for its subscription, and after it is fully reimbursed, then to the school fund of the township. This is indirectly making the State extend its aid to railroads in violation of Sec. 13, Art. 11 of the constitution of 1865; and is likewise making the county extend its aid to railroads without the assent of two-thirds of the qualified voters of the whole county, in violation of Sec. 14, Art. 11. Section 5 is the compensatory section, and may be said to sustain to the whole act the same relation that the consideration clause sustains to a contract; hence it cannot be held that this section only is inoperative. The whole act is void.

3. ———: UNINCORPORATED TOWNSHIPS. This act is also void because the Legislature had no power to authorize municipal townships to subscribe to railroad companies. It could give the power only to corporate or *quasi* corporate bodies such as counties, cities or towns.

4 **Municipal Bonds** issued under an unconstitutional statute, are void into whosoever hands they may come.

PER NAPTON, J

5.  **The Township Aid Act** has received a legislative, judicial and popular construction which leaves its validity no longer an open question.

6.  **Hough, J.,** also dissented from the opinion of the court as to the validity of the act.

7.  **Lexington & St. Louis Railroad Bonds.** The charter of the Lexington & St. Louis Railroad Company, (Acts 1859-60, p. 399,) the amendatory act of January 4th, 1860, (Ib., p. 400,) and the funding act of March 24th, 1868, (Acts 1868, p. 46,) taken together authorize the issue in payment of a county subscription to that company of bonds bearing interest at the rate of ten per cent. per annum payable semi-annually.

*Error to Lafayette Circuit Court.*—HON. WM. T. WOOD, Judge.

The coupon described in the first count of the petition was for interest at the rate of ten per cent., payable semi-annually.

*Alex. Graves* for Lafayette county.

1.   The Lexington & St. Louis railroad bonds are void, because neither the charter of that company nor the supplemental act of January 4th, 1860, authorized the county to issue ten per cent. bonds with interest payable semi-annually and the funding act of March 24th, 1868, is void, being in conflict with section 32, article 4, constitution of 1865. See *People v. Commissioners of Palatine*, 53 Barb. 71; *Grubbs v. State*, 24 Ind. 97; *People v. Mellen*, 32 Ill. 181; *State v. Lafayette County Ct.*, 41 Mo. 40.

2.   The township aid act contravenes section 13, article 11 of the constitution of 1865. Townships have no corporate capacity, and the act of March 23d, 1868, recognizes the fact that such townships have no corporate or contracting capacity; the act does not attempt to confer any such power upon the townships; but requires that upon certain conditions the subscription shall be made by

the county court, and bonds shall be issued in the name of the county for and on behalf of the township. Previous to the passage of the "aid act," the only law affecting townships is found in the Territorial law which divided each district in the territory into townships, which should constitute the territorial limit of a justice of the peace's jurisdiction and the beat of a constable. The act of March 23d, 1868, attempts to give to the county court the power to make a contract in representative capacity, and in the name of the county, which shall become a charge upon the real estate of the township, when the township itself has no power whatever to make such contract. It is the paradox of a principal which is incompetent to contract, appointing an agent to make a valid and binding contract upon that principal. If these townships may thus be charged with obligations, why may not congressional townships also? The municipal township is an arbitrary division of the territory of the State, as is also the congressional township, and as the congressional township is not a part of the county properly so considered (though it may be embraced in the county limit) so it would seem that the townships created by the territorial law are more appropriately arbitrary police sub-divisions of the State. Section 13 of the constitution, declares that the State shall not become a stockholder in any corporation, and it would seem that upon the principle "the whole is greater than any of its parts," the prohibition would apply to each integral part of the State contained in these townships.

3. The act also contravenes section 14, article 11, in that it does not require the assent of two-thirds of the qualified voters of the township to a township subscription. *Harshman v. Bates County*, 92 U. S. 569; *Kirkbride v. Lafayette County*, (U. S. C. C. W. D. Mo. November term, 1876.) Neither the *State v. Linn Co. Ct.*, 44 Mo. 507; *Bassett v. Mayor*, 37 Mo. 270, nor *State v. Binder*, 38 Mo. 450, militate against this view.

4. The act also contravenes section 16, article 11 of

the constitution.   We ask a re-examination of the decision in *State v. Linn County Ct.* upon this point in the light of the reasoning in *N. Mo. R. R. Co. v. Maguire*, 49 Mo. 503.   The precedents in this court permit this to be done.   See *Hamilton v. Marks*, 63 Mo. 167 ; S. C. 52 Mo. 78; *Shirts v. Overjohn*, 60 Mo. 305 ; *Briggs v. Ewart*, 51 Mo. 245 ; *Martin v. Smylee*, 55 Mo. 578 ; *Corby v. Weddle*, 57 Mo. 472; *Schattner v. Kansas City*, 53 Mo. 162; *Thurston v. St. Joseph*, 51 Mo. 510 ; *Gurno v. St. Louis*, 12 Mo. 415 ; *Taylor v. St. Louis*, 14 Mo. 29; *Hoffman v. St. Louis*, 15 Mo. 651.

NORTON, J.—This suit was instituted in the circuit court of Lafayette county.   The petition contains two counts, the first of which is founded upon a coupon or interest warrant of a county bond of defendant, issued to the Lexington & St. Louis Railroad Company ; the second of which is founded upon a coupon of defendant's bond for and on behalf of Sni-a-bar township, in said county, issued to the Lexington, Chillicothe & Gulf Railroad Company.   It is alleged that the bond, a coupon of which is declared upon the first count, was issued by virtue of an order of the county court, and an act of the General Assembly, approved December 9th, 1859, authorizing the county court of any county through which the Lexington & St. Louis Railroad might pass, to subscribe to its capital stock, and issue the bonds of the county in payment thereof and by virtue of an act amendatory thereof, and an act of March 24th, 1868, authorizing counties to fund their debts.   It is further alleged that the bond, a coupon of which is declared upon in the second count, was issued to the Lexington, Chillicothe & Gulf Railroad, by virtue of an order of the county court, and an act of the General Assembly, approved March 23rd, 1868, entitled "An act to facilitate the construction of railroads in the State of Missouri" and authorized by a vote of two-third of the qualified voters

of Sni-a-bar township voting at an election held for that purpose.

The defendant demurred to both counts of the petition; to the first on the ground that the acts referred to in the petition, did not confer authority on the county court to issue the bond or coupon; to the second, on the ground that the act of March 23rd, 1868, under the authority of which the coupons sued upon was issued, was unconstitutional and void. The court sustained the demurrer to the second count, overruled it as to the first, and entered judgment accordingly, to which action both parties excepted and the cause is before us on writ of error.

The exception taken to the action of the trial court, in sustaining the demurrer to the second count of plaintiff's petition, involves a determination of the validity of the act of March 23rd, 1868, under which the coupon in suit was issued. It is insisted that said act is violative of sections 13, 14 and 15, of the constitution of 1865, and before proceeding directly to the question presented, it may be useful to consider the state of the law at the time that instrument was framed and adopted in order to determine what was intended to be accomplished by the sections to which our attention has been called. Section 1, Art. 7 of the constitution of 1820, provided, " that internal improvements should be forever encouraged by the government of the State," and the General Assembly had put this injunction into practical operation by loaning the credit and issuing the bonds of the State, to various railroad enterprises, whereby a debt of many millions of dollars had been contracted, the payment of which entailed heavy burdens on the people. There was, therefore, up to 1865, no limitation on the power of the Legislature to contract debts on the part of the State, for such purposes, but a positive injunction justifying the exercise of such power. Besides this, our statutes were filled with acts incorporating railroad companies, in the charters of which, counties, cities and towns were authorized to subscribe to their capital stock, and

issue bonds in payment without submitting, either the question of subscription or the issuance of bonds, to the voters of such municipalities. Under these laws, subscriptions were freely made, bonds issued and debts contracted on behalf of counties, cities and towns, without the consent of the people charged with their payment. Such was the condition of things when the convention which framed the constitution of 1865 was called, and the facility with which acts of this character were passed and debts contracted under them, were evils it was called upon to deal with and remedy.

The convention not only left out of the constitution prepared by it, and adopted by the people, the injunction contained in the constitution of 1820, that internal improvements should be forever encouraged in the State, but, on the contrary, positively forbade giving the aid or lending the credit of the State to any corporation in the future. This prohibition is contained in section 13, article 11, and is as follows: " The credit of the State shall not be given or loaned in aid of any person, association or corporation; nor shall the State hereafter become a stockholder in any corporation or association, except for the purpose of securing loans, heretofore extended to certain railroad corporations by the State." This section effectually cured the evil of any further contracting of debts, in this respect, on the part of the State, which, anterior to that time, the Legislature had so freely indulged in. While the binding obligation of such debts, up to that time created, was fully recognized, and ample provision made for their payment, the making of any more such was wholly interdicted, and enterprises for the promotion of which these debts had been incurred, should be left (so far as the State was concerned) to be prosecuted in the future by private capital.

Having thus disposed of this matter, the evil arising from the facility with which county, city and town debts had been contracted, under legislative authorization, was

to be disposed of.  This the convention undertook to accomplish by section 14, which is as follows:  "The General Assembly shall not authorize any county, city or town to become a stockholder in or loan its credit to any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town, at a regular or special election, shall assent thereto."  This section follows immediately after Sec. 13, which, as we have seen, had stripped the State of all power to contract a debt, on account of railroads, or to become a stockholder therein, except to secure a debt already contracted, and embodies the same spirit which is to be found in Sec. 13, though not to the same extent.  The convention, by this section, was attempting to impose limitations and conditions on the power of the General Assembly, hitherto unlimited and unrestrained, and which had been, in very many cases, so exercised as to authorize county courts, city councils and town trustees, in their own discretion, and without taking the sense of the people, to subscribe to the stock of corporations, and issue bonds in payment.  This abuse of power was the mischief complained of, and intended to be remedied by the section, and to interpret it so as to make the assent of two-thirds of those actually voting, mean the same thing as the assent of two-thirds of all having a right to vote, and as a fulfillment of the constitutional prerequisite to a subscription would, we think, be doing violence to the language employed, and ignoring the import of the words, as well as the object sought to be accomplished by their use.

"Constitutions are not designed for metaphysical or logical subtleties.  They are instruments of a practical nature, designed for common use, and fitted for common understanding.  The people must be supposed to read them with the help of common sense, and cannot permit in them any recondite meaning or extraordinary gloss."  Story Con. (§ 451.)  Following this doctrine and applying the rule that words are to be understood in their usual and

commonly accepted sense, we must construe the word "assent," used in the 14th section, as meaning consent, actually expressed by the affirmative vote cast at any election authorized to be held. *State ex rel. v. Brassfield, ante* p. 331; *State ex rel. v. Sutterfield*, 54 Mo. 392; *State v. Winkelmeier*, 35 Mo. 103. The constitution prescribes as a prerequisite to any subscription, that " two-thirds of the qualified voters shall assent to it," the act of 1868 requires only the assent of two-thirds of those voting, and because of its repugnancy to the constitution, we hold it to be void.

It is urged that although the words " voting at such election," may render the act obnoxious to the constitution, it should not, for that reason, be declared void, if, by striking out those words, the act would be made to conform to it. We do not concur in this view. It must, we think, be conceded that section 14 does not enforce itself, and that no county court could be invested with authority to issue bonds, except by a law enacted in conformity with its provisions. This the General Assembly attempted to do by the act of 1868, but failed to do, by prescribing a rule for the guidance and government of the court, unauthorized by the section, and such court could only act in conformity with the authority conferred by the act. In the case of *St. Jo. & Denver City R. R. Co. v. Buchanan County Court*, 39 Mo. 485, it was held that the " constitution, except when special provision is made for that purpose, does not enforce itself. It defines certain powers, but to make them operative, legislation is necessary." In the case of *Kirkbride v. Lafayette County*, decided by Judge Dillon, at the November term. 1876, U. S. C. C., he uses the following language: " Without expressing any opinion whether there was a want of power to issue the bonds, on the ground that the railway company to which the subscription was made, and the bonds issued was not one whose line of road was near to the township, or if it be not near to the township, whether under the recital in the bond, that fact would avail to defeat a recovery by a

*bona fide* holder for value, I concur in the result, on the ground that the case is controlled by *Harshman v. Bates County*, 92 U. S. 569. The judgment of the court in that case held the act of March 23rd, 1868, recited in the bonds as the authority for their issue unconstitutional, and this is the only act authorizing township bonds like these here in suit ever passed by the General Assembly of Missouri. The circumstance in this case that two-thirds of all the voters of the township did, in fact, vote for the subscription, is without legal significance, and cannot have the effect to validate the act of March 23rd, 1868, in respect to the matter in which the Supreme Court holds it to conflict with the constitutional requirements." The vice of the words, "voting at such election," in the judgment of the court in the case of *Harshman v. Bates County*, rendered the act invalid, as is shown by the opinion of Justice Bradley, rendered therein, and the opinion of Chief Justice Waite, in *County of Cass v. Johnson*, 95 U. S. 360, who uses the following language: "In *Harshman v. Bates County*, we incidentally decided the act to be unconstitutional, but the point then specially in controversy was as to the applicability of the constitutional prohibition to township organizations."

It is also claimed that section 5 of the act of 1868 is void. It is as follows: "In all cases where a railroad, or branch railroad, in this State, shall be built, in whole or in part, by subscriptions to its stock, by counties, cities or townships, the proceeds of all State and county taxes levied upon such railroad company or branch so built, or the property thereof, shall be paid into the treasury of the counties where collected, and the county treasurers shall apportion the same, according to their several subscriptions, to such counties, cities or townships so subscribing stock, until the whole amount of such subscription is refunded to them; and such sums so apportioned shall be applied to the payment of the interest and principal of the bonds issued by such county or city on account of their

subscription of stock, as aforesaid, if any are outstanding, and, if not, it shall by them be placed to the credit of the school fund in such county, city or township." It will be perceived that this section applies all the State and county taxes which may be levied on a railroad constructed, in whole or in part, by a township subscription, first to the payment of such subscription ; second, to the payment of the bonds and interest; and, third, after payment of such bonds and interest, to the school fund of such township. Under its provisions, a township subscribing stock to the amount of $5,000, which is applied to the construction, in part, of a railroad, would be entitled to the entire State and county tax levied upon such road in the county, although its taxable value might be a half million of dollars.

This section would seem to be clearly obnoxious to both sections 13 and 14, article 11, of the constitution of 1865, in this, that to the extent that the revenue derivable from a tax on such road and its property, for county purposes is taken from the county treasury, and diverted to the payment of bonds issued for a township, every citizen of such county is made in effect, and in fact, to contribute that much more to the treasury of the county than they would otherwise have to pay, and thus a township subscription would be converted into a county subscription, not upon the vote of two-thirds of the qualified voters of the county, but on the vote of two-thirds of the voters of a township thereof. To give this provision effect would overthrow the very object of section 14, which was to prevent the citizens of a county from being taxed to pay a railroad subscription except upon the assent of two-thirds of the voters of such county. To the extent that section 5 withdraws the State tax on such roads and applies it to the payment of a township subscription, every citizen of the State, in effect, and in fact, is required to pay a part of such subscription, when section 13 of the constitution declares, " that the credit of the State shall not be given or

loaned in aid of any person, association or corporation."
It is no answer to this to say that this is not giving or
loaning the credit of the State. We agree that it is not
done directly, but that it is done indirectly is clear; for
what is the difference between giving this tax directly to
the railroad corporation, and giving it to a township to pay
a debt contracted to such a corporation? Can that be
done indirectly which is forbidden to be done directly? If
so, constitutional inhibitions accomplish nothing, and or-
ganic laws may be set at naught by the merest evasion.
We admit the power of the General Assembly to control
and dispose of the funds and revenues of the State, in its
fullest and broadest sense, but when it is limited and re-
stricted by the constitution, it is to be exercised only in
conformity thereto, and not simply according to legislative
will. We apprehend that a law declaring that 10 per
.cent. of the State taxes should be diverted from the State
treasury and applied to the payment of township subscrip-
tions to the stock of any railroad thereafter to be partly
built thereby, would be clearly violative of section 13.
The object of the inhibition imposed by section 13, was to
relieve the people of the State from the imposition, or
payment of any taxes into the State treasury, to meet any
obligation which might, in the future, be contracted by
the State, either in giving or lending its credit to, or be-
coming a stockholder in any corporation, and this object,
we think, it effectually accomplishes by absolutely forbid-
ding such debts to. be thereafter made. If, under it, the
General Assembly could not give, nor lend the credit of
the State, nor authorize the State to become a stockholder,
and raise, by taxation, money to pay such indebtedness,
when, to say the least, the State would get as a considera-
tion the stock thus paid for, it would seem to be absurd to
say that, notwithstanding the prohibition, they might, by
law, raise revenue and bestow it as a gratuity on such cor-
poration, or give it to a township to pay a debt which
they could not authorize to be contracted on behalf of the

State.    Section 5 of the act does this.    It declares to the
people of the townships that although we cannot give nor
loan the credit of the State, nor give its revenues, in pay-
ment of stock subscribed in a corporation, we authorize
you to give, and become stockholders therein, and will
give you the revenues of the State to meet the obligation.

The 5th section of the act of 1868 is the compensato-
ry section of the act, and may be said to sustain the same
relation to the whole act that the consideration clause in
a contract sustains to the whole contract.    Under its pro-
visions the people of the townships were led to suppose
that in subscribing stock to a railroad, they could in no
event become losers, as the tax provided for its payment
in said section would not only discharge the debt, but ul-
timately secure to them in all time to come a school fund
over and above that possessed by other townships.    To
declare this clause unconstitutional, and the remainder
constitutional, would be like declaring the consideration
clause of a contract void, and upholding the contract it
was intended to support; and would, we think, be in dis-
regard of the rule laid down in Cooley on Con. Lim., 178,
" that when a part of a statute is unconstitutional, that fact
does not authorize the courts to declare the remainder
void, unless all the provisions are connected in subject
matter, depending on each other, operating together for
the same purpose, or otherwise so connected in meaning
that it cannot be presumed that the Legislature would
have passed the one without the other."    The 5th section
of this act being the part evidently intended to induce the
subscription, the payment of which it provided for, we
may reasonably presume that the General Assembly would
never have passed the law with this section left out.    Hence,
as the provisions contained therein are connected in subject
matter with the other provisions of the act, operate to-
gether, and are united in purpose, the whole act is con-
taminated with the vice of the 5th section and must fall
with it.

It is also argued that the act of 1868 is void, because the General Assembly had no power to authorize townships as organized in this State, to subscribe to the capital stock of corporations, and issue bonds or impose a tax to pay it. This question is not free from difficulty. The right or power of the Legislature of a State to authorize aid in the construction of railroads, has not, as we think, been extended or applied to any other than municipal, public or *quasi* corporations, and we think it may be affirmed that no case is to be found, where the point here raised was presented and considered, in which it has been adjudged that such an authority can be delegated to a township not having a corporate or *quasi* corporate existence. Under our law, townships of the various counties have no such corporate being, they are not clothed with any of the incidents or powers of a corporation. They can neither sue nor be sued, contract nor be contracted with, but are mere geographical divisions of a county, made principally for election purposes, in each of which the people may elect a constable and two justices of the peace. It is declared in section 104, page 218, Dill. on Cor., "that a long line of unbroken decisions, in the courts of most of the States, has established the principle that in the absence of special restrictive constitutional provisions it is competent for the Legislature to authorize a municipal or public corporation to aid in the construction of railways, running near or to, or through them, by subscribing to their stock and taxing the inhabitants or the property, within their limits, to pay the indebtedness thereby incurred." An examination of the cases cited, from twenty or more States, as authority for the text, we think, discloses the fact that in no one of them was such authority conferred on any other than a municipal or public corporation. When in any case cited, the authority was conferred upon a township, such township had a corporate existence, and could contract, sue and be sued as a county, city or town. This being so, we cannot consent to extend the

principle as laid down by this writer, so far as to say that the Legislature of this State could confer an authority to aid in the construction of a railway, to a township having no corporate existence and sustaining only the same relation to a county that the ward of a city does to the city.

Counties, cities, towns and townships, only when they were corporations, were the only classes of political subdivisions of the States upon which it had been adjudged the Legislatures had power to confer the rights to aid in the construction of railroads by subscribing to their capital stock, and paying therefor by the issuance of bonds and taxation.   In other words, it had only been held, when the constitution of 1865 was framed, that unless a State constitution contained restrictions on the power of the Legislature, it might confer the right on counties, cities, towns and townships, when such townships had corporate existence, to become stockholders in railways and lend their aid to such enterprises.   And as in this State, townships had no such corporate being, as the towns of New England States or the townships of many of the Western States, but as before stated, were mere geographical sub-divisions of counties, and hence the members of the convention were not called upon, nor was it necessary that they should impose a restriction on legislative power as to such townships, because it had not then been adjudicated, (although the courts had gone to extreme lengths on this subject,) that the Legislature of a State could confer the right to aid in the construction of a railroad on any mere geographical sub-division of the State, not rising to the dignity at least of a *quasi* corporation.   While the decisions of courts of the highest character in three-fourths of the States have established the right of a State Legislature, unless forbidden by organic law to exercise the extraordinary power of authorizing municipal corporations to impose taxes and contract debts for the purpose of constructing railways, the doctrine was, in most cases, dissented from by eminent judges, and has always met with much professional disap-

proval. Dill. on Mun. Cor., § 104. If an original propo-sition, we would hold that such power did not exist at all ; but it has been for so long a time settled the other way, and so repeatedly decided, that to the extent that these decisions have gone, the question is no longer open for dis-cussion, and the rights acquired under them cannot be overthrown. But the question as to whether the power existed in the Legislature to confer the right on any other than a municipal or *quasi* corporation, is not of that char-acter, and we are inclined to deny that such power existed, either under the constitution of 1820 or 1865.

While we concede that it has been established by the courts that railways are such public improvements as would authorize a delegation of the taxing power to municipal corporations, we do not concede that this principle has been so far extended as to justify a delegation of it to a township, a mere geographical sub-division of a county, and in no sense a corporation. If so, may not a majority of the citizens of a congressional township, which is a legal sub-division of a county, embracing 36 sections of land, or the citizens of a section of 640 acres, or a quarter section of 160 acres, be empowered to subscribe stock to a railway, issue bonds and levy a tax on such township, sec-tion or quarter section? While we admit that the State, in the exercise of the right of eminent domain, may im-pose taxes and delegate through its Legislature the taxing power to its local municipal authorities for local improve-ments, and to be controlled by such authorities, we are un-willing to give it a wider scope than we think the adjudged cases allow, and extend its operation to mere territorial divisions of a county, the logical result of which would be as above indicated.

It is claimed that since the adoption of the constitu-tion of 1865, this court, in the Linn county case, *infra.,* and the case of State, to the use of *Neal v. Saline County Court,* has determined otherwise. We think an examina-tion of the cases will show that the point was not in either

of them. In the last case the only question was whether an innocent purchaser of a bond, which recited on its face that it had been issued under and in pursuance of an act of the Legislature, would be protected by such recital, although, in truth and fact, the county court in issuing the bonds had not pursued the authority conferred. The power of the Legislature to confer the authority was not brought in question. In the Linn county case the point was made that the bonds, for the issuance of which the proceeding was instituted, would be, if issued, the bonds of the county, and not of the townships, and therefore obnoxious to section 14 of the constitution, and the question of power was not raised. It is insisted that this court, by its former adjudications, is precluded from a consideration of the validity of the act of 1868, and the doctrine of *stare decisis* has been invoked and pressed on our attention. If the constitutionality of this act had been heretofore fully presented and considered and declared valid, thereby establishing a rule of property, we would hesitate long before overturning or unsettling it in any degree. We think this has not been done, and the case on which the claim is based is that of the *State ex rel. v. Linn County Court,* 44 Mo. 504, in which the points now before us were neither made nor considered and all that it decided was that a bond issued under the terms of the act would not, in any sense, be a county, but to all intents and purposes a township bond. The question before us was neither made nor considered in that or any other case, and this is conceded by the court in the case of *Cass County v. Johnson,* 95 U. S. 360, in which it is said that "it is true that the objection now made to the law was in no case presented or considered." The objection now before us is identically the same which was before the court in *Cass County v. Johnson, supra,* and this being so, we have the authority of the Supreme Court of the United States in the case of *Boyd v. State of Alabama,* 94 U. S. 648, in saying that we are not precluded from a full consideration of the subject.

The court in that case held that "courts seldom under-
take, in any case, to pass upon the validity of legislation
when the question is not made between the parties.   Their
habit is to meet questions of that kind, when they are
raised, but not to anticipate them.   Until then, they will
construe the acts presented for consideration, define their
meaning, and enforce their provisions.   The fact that acts
in this way have often been before the court is never a
reason for not subsequently considering their validity
when that question is raised.   Previous adjudications upon
other points do not operate as an estoppel against the par-
ties in new cases, nor conclude the court, upon the consti-
tutionality of acts, because that point might have been
raised and determined in the first instance."   Besides this,
in view of the fact that at the October term, 1875, an
opinion was delivered by the Supreme Court in case of
*Harshman v. Bates County*, 92 U. S. 569, declaring the act
of March 23, 1868, unconstitutional and void, and stamp-
ing the bonds issued under it as valueless; and in view of
the fact that this was accepted as the law of the land for
two years before it was overruled and recalled, in the case
of *Cass County v. Johnson*, during which time ample op-
portunity was afforded to mere schemers and speculators
to procure the bonds thus declared to be worthless, for a
song, we are not inclined to lend an attentive ear to the
invocations now made that the act of 1868 is a sealed
book, so far as the determination of its validity by this
court is concerned, especially in face of the concession
that it has never before been determined in any case which
has been before us.

It is also urged that the bonds have been issued, placed
on the market, and have passed into the hands of inno-
cent purchasers, and should, therefore, be upheld.   While
bonds of the character involved in this suit have been put
on the footing of commercial paper, we apprehend no well
considered case can be found which asserts that a bond is-
sued under a law absolutely null and void, will be enforced

by the courts in the hands of anybody. A purchaser of such bond takes it charged with notice of a total want of power to issue it, and, if issued under an unconstitutional law it is void into whosever hands it may come. Cooley's Con. Lim., 188 and 215; Dill. Mun. Cor., § 108, page 228; *County of Dallas v. MacKenzie,* 94 U. S. 660. While loss to the holder of a bond issued under a void law would necessarily result, it should not be forgotten that to enforce the payment of such bonds by striking down the organic law would inflict a severe blow on good government and entail a greater loss on the community at large than mere pecuniary sacrifice. While it is the duty of courts to employ all the appliances and agencies provided for that purpose, to compel the payment of all obligations which are recognized as legal, it is equally their duty to prevent the use of any of them in the enforcement of any obligation which is illegal and void. While it would be unjust not to give force and effect to a valid contract, it would be equally unjust to give effect to a contract which the law pronounces void, either because not allowed or forbidden to be made.

The only other alleged error, as appears from the record, is the action of the court below in overruling the demurrer to the first count of the petition. It is claimed in support of the demurrer that the acts recited in the bond did not confer on the county court the authority to issue it. We think this position is not well taken, and without specially considering the objection referred to, in the brief of counsel, deem it sufficient to say that, under the act of 1859, incorporating the Lexington & St. Louis Railroad Company, an act supplemental thereto, approved January 4th, 1860, and an act entitled "an act to authorize counties, cities and towns to fund their respective indebtedness," approved March 24th, 1868, the county court had full authority to issue the bonds in question, and that the demurrer was rightly overruled.

Perceiving no error, we affirm the judgment rendered

for plaintiff on the first count of the petition, and we also affirm the judgment rendered for defendant on the second count, in which SHERWOOD, C. J., and HENRY, J., concur: Judges NAPTON and HOUGH dissent from the views here expressed as to the constitutionality of the act of March 23, 1868.

AFFIRMED.

NAPTON, J. DISSENTING.—Whatever might have been the proper construction of the article in the constitution of 1865, in regard to township subscriptions and bonds, under the act of 1868, we have a legislative, judicial and popular construction of it, which, in my judgment, makes it no longer an open question. The Legislature gave an interpretation to the constitution by the act of 1868, the highest judicial tribunal in the State sanctioned that construction in the Linn county case; the convention of 1875, representing, as we assume, the will of the people, recognized this construction; and now this court is called on at the end of ten years from the passage of the act, and after the investment of millions of dollars in bonds issued on the faith of legislative, judicial and popular interpretation, to declare the act void, and all the money invested in bonds authorized by it, to have been thrown away. I prefer to decline this responsibility. Had I been on the bench when the Linn county case was determined, and bonds were ordered to be issued, thereby affirming the constitutionality of the act of 1868, my opinion might have been otherwise than the one announced. As the opportunity did not offer, I can't say, with propriety, what my opinion would have been—but I can say now, that whatever it might have been, I would never, subsequently to the action of the counties in conformity to the opinion of the court and the investment of capitalists in the bonds issued, undertake to set up my individual opinion in opposition to the declared sanction of the court. The matter was *res adjudicata* so far as bondholders, who invested on the faith of it, were concerned,

and so this court declared in *State, use of Neal, v. Saline County*, (48 Mo. 391,) and so this court unanimously decided in *The State v. Miller*, (50 Mo. 129). In fact, the constitutionality of the act of 1868, upon the point now urged, was never questioned in this State until the decision of the Supreme Court of the United States in *Harshman v. Bates Co.*, a decision which that court retracted on the first opportunity. So that when the present case arose, the law had the sanction of the Legislature, the State judiciary, the Federal judiciary and the convention of 1875. Legislative, judicial and popular interpretation all corresponded, and on the faith of this construction, bonds, to the amount of millions of dollars, were purchased by our citizens, and the only effect of the present decision is to annul their title, whilst the citizens of other States and foreigners may still proceed to get judgments and collect them.

I, therefore, dissent, in toto, from the decision.