**ASSOCIATION OF CLERICAL EMPLOYEES OF ATCHISON, T. & S. F. RY. SYSTEM et al. v. BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS et. al.**

No. 5837.

Circuit Court of Appeals, Seventh Circuit.

July 8, 1936.

James E. Smith, E. H. Hatcher, and Frank H. McFarland, all of Topeka, Kan., for appellants.

Emmet Trainor and Homer W. Davis, both of Chicago, Ill. (Charles H. Woods, of Chicago, Ill., of counsel), for Railway Companies.

Frank L. Mulholland, of Toledo, Ohio, and Leo J. Hassenauer, of Chicago, Ill., for appellees, Brotherhood and others.

John Dickinson, Asst. Atty. Gen., Leo F. Tierney and Wendell Berge, Sp. Assts. to the Atty. Gen., Robert L. Stern, Sp. Atty., Department of Justice, of Washington, D. C., and Harry N. Connaughton and Earle C. Hurley, Sp. Assts. to U. S. Dist. Atty., both of Chicago, Ill., for appellee Michael L. Igoe.

Before SPARKS and ALSCHULER, Circuit Judges, and LINDLEY, District Judge.

ALSCHULER, Circuit Judge.

Appellants complain of the rulings of the District Court denying their motion for a temporary injunction, and on motion dismissing the bill.

The bill challenges the certification of the National Mediation Board (herein called Board) that at an election called by the Board, under the Federal Railway Labor Act as amended (45 U.S.C.A. § 151 et seq.), appellee Brotherhood was chosen to represent the clerical employees of the Atchison, Topeka & Santa Fé Railway System in negotiations with their employer for agreements for wages and conditions of labor for that craft. The bill having been on motion dismissed for want of equity, it must be looked to for the facts. It charges that ever since 1927 that craft was represented in all such negotiations by appellant Association (herein called Association), it having been duly chosen therefor by the craft; that the Brotherhood had

represented to the Board that a majority of the craft favored the Brotherhood's acting in such capacity for the craft; and that the Board, finding that a dispute existed with reference to the representation, called and conducted an election of the craft to determine whom the craft favored for such representative; and that the Board found and certified that a majority of the craft were favorable to the Brotherhood, and made such certification to the craft and to the employer. Under the Railway Labor Act of 1926, as amended June 21, 1934, such finding by the Board, unless and until in some way set aside or abrogated, is binding upon the members of the craft.

The bill further charges that the certification by the Board specifies as follows:

Number of employees on the list of
  eligible voters ...................6,016
Number voting for representation by
  the Brotherhood .................2,854
Number voting for representation by
  the Association ...................2,793
Number voting for representation by
  miscellaneous individuals or other
  organizations ....................... 6
Number of ballots not allocated:
    (a) Blank ballots, not voted..... 21
    (b) Ballots voted but improperly
        marked ................. 41;

That appellants objected to the votes of 22 employees at the Newton plant, but their votes were allowed and separately counted, showing:

For the Brotherhood................ 12
For the Association ................ 6
For miscellaneous individuals or for
  other organizations............... 2
Ballots voted but improperly marked 2

The main contention of appellants is that the vote for the Brotherhood falls short of being a majority of all the members of the craft found qualified to vote, and that therefore the certification by the Board is in contravention of that part of section 2 (Fourth) of the Railway Labor Act as amended (45 U.S.C.A. § 152, subd. 4), which reads: "The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter."

If this part of the act is to be given the construction for which appellants contend, then the Board's finding—that the Brotherhood was the duly elected representative—was clearly improper, since the number voting for the Brotherhood falls somewhat short of a majority of the entire eligible membership, although in excess of the number voting for representation by the Association.

Language more or less similar to that of this statute—fixing the vote required to carry a given measure—has been variously construed by courts. In Missouri there was a constitutional provision that: "The General Assembly shall not authorize any county, city, or town to become a stockholder in, or to loan its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent thereto." Const.Mo.1865, art. 11, § 14. The General Assembly passed a statute authorizing subscriptions by townships to the capital stock of railroads whenever two-thirds of the qualified voters of the township, *voting at an election called for that purpose*, shall vote in favor of the proposition. Prior to the decisions in State ex rel. Woodson v. Brassfield, 67 Mo. 331, and Webb v. Lafayette County, 67 Mo. 353, it had been several times held, although no objection of unconstitutionality was raised or considered in these cases, that rights founded upon such statute were enforceable. State v. Linn County Court, 44 Mo. 504; State v. Bates County Court, 57 Mo. 70; State v. Daviess County Court, 64 Mo. 30; and several other cases. But when afterwards the Woodson and the Webb Cases came before that court, it was decided that the constitutional requirements were not complied with unless two-thirds of all the municipalities' qualified voters had voted affirmatively, and that the Legislature had no power to pass an act authorizing municipalities to issue their obligations upon a vote of two-thirds of those *voting upon the proposition* if this was less than two-thirds of all the qualified voters.

This same provision of the Missouri Constitution was considered in three cases before the United States Supreme Court. In the first, Harshman v. Bates County, 92 U.S. 569, 23 L.Ed. 747, where it was conceded that such a statute was unconstitutional, the court so held. The second case, and one which has become a leading authority for the proposition therein stated,

is County of Cass v. Johnston, 95 U.S. 360, 24 L.Ed. 416. In this there was no concession of unconstitutionality, and upon full consideration of the constitutionality of the Missouri statute (Acts Mo.1868, p. 92) authorizing the bond issue if voted by two-thirds of those voting upon the proposition, the court reversed its decision in the Harshman Case and upheld the constitutionality of the statute and the validity of the bonds issued under it. A third case thereon is Douglass v. County of Pike, 101 U.S. 677, 25 L.Ed. 968, wherein, in the face of the holding by the Missouri Supreme Court that such statutes were unconstitutional, the court adhered to its decision in County of Cass v. Johnston.

Carroll County v. Smith, 111 U.S. 556, 4 S.Ct. 539, 28 L.Ed. 517, dealing with the Mississippi Constitution, was a case almost identical with the Douglass Case, and a like result was there reached.

Appellants cite People ex rel. Davenport v. Brown et al., 11 Ill. 478, and appellees cite People ex rel. Mitchell v. Warfield, 20 Ill. 159, 160. The Brown Case was decided under a then constitutional provision that township organization might be adopted upon the favorable vote of a "majority of the voters of such county, at any general election." At the general election, where more than 600 votes were cast, a total of 260 voted on the county seat proposition, those favoring township organization having the majority of the votes so cast. The court held that, since the Constitution required the proposition to be voted on at a general election, this indicated that the required majority in favor of removal must be of all the votes cast at that election, rather than only the votes on the proposition. In the Warfield Case the question as to the voters required to remove a county seat arose incidentally. The Constitution specified that the removal might be made on a favorable vote of "a majority of the voters of the county." At a special election on that proposition a majority of those who voted favored removal, but it was alleged that this was not a majority of all voters of the county. The court, while deciding the case on other grounds, stated that under this provision the favorable vote of a majority who voted at the election would carry the proposition for removal. This case was cited with approval by the United States Supreme Court in County of Cass v. Johnston.

In People ex rel. Wheaton v. Wiant, 48 Ill. 263, the court, approving what was stated in the Warfield Case, said that where an election on a proposition for removal of a county seat involved that question alone, a majority of the votes cast thereon will govern regardless of what was the number of voters qualified in the county. Although that case was disposed of on other grounds, on this proposition the court said: "To give it a different construction, would involve an inquiry, whether there were other voters of the county who had, from any cause, abstained from voting, and this would lead to interminable inquiry, and invite contests in such elections, which would be embarrassing and baneful, if it did not destroy all of the practical benefits of laws passed under these provisions of the constitution."

We believe this reasoning might well be applied here, where the statute in question was passed to meet conditions which had at times seriously threatened the interruption of commerce between the states, and to cope with ofttimes extreme exigencies which, unless promptly and effectively met, might seriously disturb the very foundations of orderly and effective government.

The Constitution of Indiana (article 16, § 1) provides that amendments to it may be adopted by the affirmative vote of a majority of the members elected to each House at two succeeding General Assemblies, and submission to and ratification by a majority of the "electors of the State." In a number of cases in that state it had been held that this required the affirmative vote of a majority of the electors of the state rather than the majority vote of those voting upon the subject of ratification. State v. Swift, 69 Ind. 505; In re Denny, 156 Ind. 104, 59 N.E. 359, 51 L.R.A. 722; In re Boswell, 179 Ind. 292, 100 N.E. 833. But very recently the Supreme Court of that state again had the question before it, and upon review of prior decisions it decided that a constitutional amendment was duly ratified if it received a majority of those *voting upon the proposition,* although such majority was less than a majority of all the electors of the state. In re Todd, 193 N.E. 865.

In the brief operation of the federal statute respecting election of such representatives of crafts since the adoption of the amendment of 1934, the Board had assumed that the vote of the majority of the

members of the craft qualified to vote was necessary for the choosing of a representative. But shortly before this matter came before the Board, the United States District Court for the Eastern District of Virginia, Norfolk Division, on July 24, 1935, decided a case in all essential particulars involving the same question as that here under consideration, and on that date filed an exhaustive opinion holding that, under the statute as amended, a majority of the members of the craft, voting at an election called to choose a representative, was sufficient to that end, although such a majority was less in number than a majority of all who were qualified to vote, provided that all those who voted constituted a majority of those qualified to vote. System Federation No. 40, etc., v. Virginia Ry. Co. (D. C.) 11 F.Supp. 621.

■ In passing on the instant controversy the Board stated it was advised that this decision properly interpreted the law which governs, and that it had applied in this case the principles as laid down by District Judge Way in that opinion. From the decree which followed Judge Way's opinion an appeal was taken, and under date of June 18, 1936, the Circuit Court of Appeals of the Fourth Circuit, speaking by Judge Parker, filed an opinion (Virginia Ry. Co. v. System Federation No. 40, etc., 84 F. (2d) 641) sustaining the decree of the District Court as to all matters which were in issue on that appeal. The opinion presents full and lucid disposition of the propositions involved. The question of the election of a representative under the statute was the same as it is here, and the vote there presented an identical situation. The conclusion was reached that where a majority of those qualified to vote had in fact voted, a proposed representative receiving a majority of the quorum which thus voted was the duly elected representative under the statute. Upon the question of the vote necessary under the amended statute, we are in full accord with the reasoning and conclusion of the opinion of the Fourth C.C.A., as well as that of District Judge Way.

■ Appellants urge that because the Board had previously held that a proposed representative not receiving a majority of all those who were found qualified to vote was not chosen as a representative under the statute, the Board was equitably bound to apply here the same practice. It is charged that the Board had notified these contestants that the proposed representative receiving the vote of a majority of *all the qualified voters* of the craft would be the one chosen; and it is argued that in such case a member not voting, in effect votes against any change in existing conditions, wherefore nonvoting members favoring the existing representative might with impunity refrain from voting; and that it would be inequitable to apply a different interpretation of the statute without prior notice by the Board of its change in ruling. It does not appear that the notice to hold the election assumed to make any interpretation of the statute beyond quoting the words of the statute itself. The statute speaks for itself, and when judicially called in question the court must interpret it, regardless of the previous practice of the Board. The Board, though having construed it in a prior instance, is not bound to the same construction if thereafter it becomes satisfied that a different construction should be given. In a case such as this we think the general rule applies that those not voting at an election should be considered as assenting to the will of the majority there expressed. County of Cass v. Johnston, 95 U.S. 360, 24 L.Ed. 416.

■ But the facts do not bear out the allegation that the qualified voters were prejudiced or misled by the alleged change in the interpretation. As has been seen, Judge Way's decision was rendered July 24, 1935. It is not reasonable to suppose that those interested in this case were not promptly made aware of that decision, which involved a construction of the same statute under practically the same circumstances, involving the same question of construction and representation by the Board. Certain of appellees' counsel appeared in both cases. The election here was not called until some time after that opinion had been filed. Pursuant to the notice, the election commenced September 25, 1935, and was concluded on October 18, 1935. Whether voters or counsel for the various parties were in agreement with Judge Way's views is not material. There was at least a judicial interpretation in a similar controversy which would make more hazardous any reliance upon non-voting as equivalent to a vote to retain the existing representation. Even if the construction which the Board had given to the statute in conducting some previous election might, under a proper state of facts,

have raised an equitable estoppel, or some other equity, in favor of appellants, as contended for, in our judgment the facts alleged fall far short of raising an estoppel here.

■ But the Association contends that, whatever the construction of the statute, the Board improperly decided that the Brotherhood was chosen. There are involved 22 voters at the so-called Newton plant and 117 at the so-called Corwith plant. When these employees presented themselves for voting, the Association objected to their votes being received. The objection was sustained as to Corwith employees, but overruled as to the 22, who thereupon voted, their votes being separately kept so that it might appear how, if at all, the votes would affect the result. It is conceded that the 22 votes did not affect the result. If the Corwith votes had been received it would have increased the total of eligibles by 117, and if all these had voted for the Association it would have given the Association a majority over the Brotherhood. But, be this as it may, these votes were rejected on the objection of the Association, and it is now in no position to assert impropriety in their rejection. Indeed, it has not asserted there was any impropriety therein; but the contention is made that the 22 were on the same basis as the 117, and that if the 22 were received it was improper to have excluded the 117, and that, therefore, a court of equity should regard the 117 as votes which should have been received, and that had they been voted they might have changed the result, and that therefore at best the election was void.

■ The fact that the 22 were received can in no way affect the rejection of the 117; and the fact that the Association's objection to the 22 was not sustained does not tend to render improper the otherwise unchallenged action of the Board in rejecting the 117. The two sets of employees were at different plants and not associated together; and while the statement in the bill—that they were in general doing the same class of work—is accepted, this does not necessarily require the conclusion that both should have had the same treatment. There may have been other sufficient reason for admitting the one and rejecting the other. But, be this as it may, the Board is vested with a large discretion, and with a power to conduct the election and to determine who are qualified to vote thereat;

and in the absence of a definite showing of fraud or other gross impropriety of the Board whereby an improper result has been certified, courts will not interfere.

■ It further appears that of the ballots received 21 were blank ballots and 41 were rejected because improperly marked. The Association contends that, treating all these ballots as having been cast, the Brotherhood lacked 4 votes of having a majority of the ballots which were received, and therefore it did not receive the majority necessary to election. The case of Lodoen v. City of Warren, 118 Minn. 371, 136 N. W. 1031, is cited in support of the contention. The court was there dealing with a statute (Sp.Laws 1891, c. 44, subc. 5, § 5, subd. 2) which required a certain proposition to receive a majority of the "votes cast" in order to carry it, and it was held that votes offered and received were "cast" within the purview of the statute and must be counted in determining whether a majority of votes cast was for the proposition. The statute with which we are dealing does not provide for a majority of the votes *cast,* but specifies that, "The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter." We have indicated our views as to the construction to be placed on this statute, and in our judgment a blank ballot is not to be regarded in any other light than as a failure to vote by one qualified to do so. Excluding from consideration the 21 blank ballots, and treating them as though these members had not voted at all, and adding to the total vote reported the 41 rejected ballots, the Brotherhood would still have a majority of 7 of that total. It is not contended that the defectively marked ballots were improperly rejected, and the good faith or action of the Board in that respect is not challenged. Surely it was acting within the scope of its statutory authority; and although we are of the belief that under this statute ballots improperly marked and in good faith rejected should be regarded in the same light as blank ballots, or as an omission to vote of an eligible member, it is not necessary to decide this if we are correct in our conclusion respecting the blank ballots.

The order of the District Court denying the temporary injunction, and its decree dismissing the bill on motion of defendants, are affirmed.