# UNITED STATES v. CITY NAT. BANK OF DULUTH.

## No. 1835.

District Court, D. Minnesota, Fifth Division.

Jan. 24, 1939.

Victor E. Anderson, U. S. Atty., and Lewis N. Evans, Asst. U. S. Atty., both of St. Paul, Minn., for plaintiff.

Theodore Hollister, N. B. Arnold, Austin Lathers and Jay H. Hoag (Lathers & Hoag), Ralph E. Burdick, and H. S. Campbell, all of Duluth, Minn., Frank Yetka and Hanford Cox, both of Cloquet, Minn., and V. J. Michaelson, of St. Paul, Minn., for defendant.

JOYCE, District Judge.

This case was tried before the court on a stipulation of facts, deposition, and certain exhibits, and briefs of the respective parties.

Briefly, the facts are: Mary LaCourse resided in Herman Township, St. Louis County, Minnesota, and was a victim of the devastating forest fire which swept northeastern Minnesota on October 12, 1918, destroying an area of between 1,500 and 2,000 square miles, with resulting damage said to

have approximated $40,000,000 and the loss of 500 lives. The fire was one of the outstanding tragic events in the history of Minnesota and was found by the courts to have resulted from negligent operation of the railroads then under Government control as a war measure. Mary LaCourse received burns from which she died. An action was brought in the District Court of St. Louis County, Minnesota, by the administrator of her estate against John Barton Payne, Agent of the President under the Transportation Act of 1920, 49 U.S.C.A. §§ 71–74, 76–78, 141, the Great Northern Railway and the Duluth, Missabe & Northern Railway Company, for wrongful death in the amount of $7,500. Thereafter, following the substitution of James C. Davis, as Agent of the President as sole defendant and his inauguration of the policy of settling claims within certain litigated areas, the LaCourse claim was examined, adjusted and valued in the sum of $1,000. This claim was one of a large class which were settled by payment of a certain percentage of the amount at which each claim had been valued and it then, because of the refusal of the Director General of Railroads to pay the full amount, became the basis of a stipulation providing for judgment in the District Court of St. Louis County in the sum of $400 against the Director General of Railroads. This judgment was paid and satisfied. Apparently the only alternative to acceptance of payment by the claimants on this basis was the prosecution of lawsuits, of which there were thousands pending which it is conceded would have taken years to finally determine.

On account of the opinion prevailing in the State of Minnesota that claimants were compelled by their dire needs as a consequence of the fires to accept payment of their claims on the basis offered by the Director General of Railroads in amounts which were substantially less than the value determined by him in some instances and in other instances by the courts, commencing with the Seventy-first Congress of the United States in 1930 legislation was proposed for the relief of claimants who had suffered loss by said fires. Efforts were made to obtain relief for these fire sufferers at the hands of each succeeding Congress, but it was not until the Seventy-fourth Congress, when the Senate on June 10, 1935, and the House of Representatives on August 20, 1935, passed Private Number 336, which was then approved by the President on August 27, 1935, 49 Stat. 2194, that relief took concrete form.

On November 7, 1935, the defendant herein was appointed special administrator of the estate of Mary LaCourse. Thereupon such special administrator in accordance with the terms of the new act, made application to the Comptroller General and submitted for payment a claim in the amount of $600, the difference between the $1,000 determined originally to have been the value of the cause of action in the Mary LaCourse case and the $400 already paid. This claim was allowed and was presented according to law by appropriate certificate to the Secretary of the Treasury of the United States, who in turn caused payment of the sum of $600 to the defendant herein on October 5, 1936. It is for the recovery of said amount that the present action was filed on April 26, 1937, it being contended that the Comptroller General of the United States in making settlement of the LaCourse claim did so through inadvertence, by mistake and in error; that said claim was and is not one properly submitted and properly allowable under the Act of Congress above referred to and that the Comptroller General in allowing said claim acted in a manner not authorized by law. The defendant asserts that the claim was properly allowed and paid and that the death of Mary LaCourse was such a loss as was contemplated by the statute referred to.

The portions of the statute pertinent to the issues involved in this case read as follows:

"That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, in accordance with certifications of the Comptroller General of the United States under this Act, to each claimant or its or his heirs, representatives, administrators, executors, successors, or assigns, the amount of whose loss on account of fire originating from the operation of railroads by the United States in the State of Minnesota on or about October 12, 1918, has been determined by court proceedings or by the Director General of Railroads, the difference between the amount of such loss so determined and the amount actually paid by the United States to such claimant less any amount paid to such claimant by any fire-insurance company on account of such fire: Provided, That notwithstanding the terms and conditions of any policy of insurance, or the provisions of any law,

no fire-insurance company, except farmers' mutual fire-insurance companies, shall have any rights in and to funds herein appropriated, the payments herein provided for, nor to any right of subrogation whatsoever. That said farmers' mutual fire-insurance companies shall be paid in the same manner and to the same extent as other claimants: Provided further, That no person who makes claim under this Act by virtue of having acquired and succeeded to the rights of the original claimant through purchase and assignment, from said claimant of said claim, shall receive more than the amount actually paid for such claim and assignment.

"Sec. 2. No payment under the provisions of this Act shall be made unless an application therefor is filed with the Comptroller General of the United States by or on behalf of the person entitled to payment within two years after the date of the enactment of this Act. The Comptroller General of the United States shall determine the amount due on any application, and the person entitled thereto under this Act, and shall certify such determination to the Secretary of the Treasury, which determination shall be final. The Comptroller General shall promulgate rules and regulations as to the identity of claimants, the validity of assignments, and all other matters in connection with the determination of the amounts due and the persons to whom such amounts shall be paid under this Act. The amount to be paid under this Act shall be ascertained from the records of the Director General of Railroads, and such records shall be conclusive evidence of the amount of any such loss, the amount paid by the United States with respect thereto, and the amount paid by any insurance company with respect thereto. Such records shall also be conclusive evidence of the person entitled to payment, except that if in any judicial proceeding in which final judgment has been rendered the right of any person to succeed to the rights of the person who suffered the loss by the fire has been determined, such judgment shall be conclusive as to the heir, representative, administrator, executor, successor, or assignee, as the case may be, entitled to payment. * * *"

The plaintiff rests its case upon a ruling of the Comptroller General of the United States to the effect that the "loss" referred to in Section 1 of the Act meant only property loss and did not comprise damage to person or loss of life as a result of the fires in question. This interpretation is based upon the provisions of the Act relating to fire-insurance companies, it being contended that since there was a specific limitation and restriction in the Act with reference to fire-insurance companies and an exception with reference to farmers' mutual fire-insurance companies that Congress was speaking in terms of property losses only; that payments under the Act were to be limited to claims covering property losses, and that losses of any other character were not within the purview of the Act.

In plaintiff's brief it is stated: "The term used is the word 'loss' and not 'damage' and this word must be defined in connection with its context and here the use of the term 'fire insurance company' becomes important"; from which it would appear that if the word "damage" had been used in the Act instead of the word "loss", the ruling of the Comptroller General would have been in favor of allowance of claims of the character here involved. As against this the claimants contend that a person whose arm or leg had been burned, or whose life was taken by the fire, has suffered a loss fully as much as if his barn, his car or his live stock had been destroyed. It may be noted that the then Attorney General, the Hon. Homer Cummings, in his letters approving the bill to both the President and Senator Bailey of the Senate Committee on Claims, apparently used the words "loss" and "damage" interchangeably. The report of the House Claims Committee treated the words as synonomous. Specifically it is contended by defendant that either the word "loss" has greater content that the word "damage", or the two words have the same significance and may be used interchangeably. This view has found frequent expression in the decisions of the courts.

In Fay v. Parker, 53 N.H. 342, 16 Am. 270, the word "loss" is defined as follows: "Loss is the generic term. Damage is a species of loss. [They are synonomous.] Loss signifies the act of losing, or the thing lost. Damage—in French, dommage; Latin, damnum, from demo, to take away—signifies the thing taken away,—the lost thing, which a party is entitled to have restored to him so that he may be made whole again."

In the case of In re City of Pittsburgh, 243 Pa. 392, 90 A. 329, 331, 52 L.R.A.,N.S., 262, the court said: "These words 'damage,' 'loss,' [and] 'injury' are used inter-

changeably, not simply in this particular statute, but generally; within legislative meaning and judicial interpretation they import the same thing."

In State v. Pittsburgh, C., C. St. L. R. Co., 68 Ohio St. 9, 67 N.E. 93, 96, 64 L.R.A. 405, 96 Am.St.Rep. 635, the court said: "In the case of injury or destruction of the property insured, or injury by accident, or liability for death, the liability is called a 'loss.' "

In Birrell v. Fidelity & Casualty Co. of New York, 193 Iowa 860, 188 N.W. 26, 29, the court said: "A loss necessarily implies a deprivation or a damage. Its synonyms are 'detriment,' 'privation,' 'injury,' and 'damage.' Webster's Dictionary."

In Bosher v. International R. Co., D.C., 15 F.2d 388, 389, the court said: "The federal rule of damages for personal injuries was intended to give remuneration for the actual pecuniary loss involved."

The term "loss" is defined in Corpus Juris as follows: "Loss. A generic and relative term. Loss is not a word of limited, hard and fast meaning. It may mean either the act of losing or the thing lost. * * * The term has been held to be synonomous with, or equivalent to, other terms, as for instance, damage, damages, deprivation, detriment, injury, privation." 38 C.J. 244.

In Wood v. Security Mut. Life Insurance Co., 112 Neb. 66, 198 N.W. 573, 575, 34 A. L.R. 712, definitions of "damage" are quoted from Black's Law Dictionary and Bouvier's, as follows: "The word 'damage' has been defined as 'loss, injury, or deterioration, caused by the negligence, design, or accident of one person to another, in respect of the latter's person or property.' Black's Law Dictionary. 'The indemnity recoverable by a person who has sustained an injury, either in his person, property, or relative rights, through the act or default of another.' [1] Bouvier's Law Dictionary [Rawle's Third Revision, p. 749]."

It is clear that in his settlements the Director General of Railroads made no distinction on account of the loss suffered by the various claimants, whether for loss of property or personal injury or loss of life. In many cases, as shown by the deposition of J. Malcolm Turton, Claims Examiner in the General Accounting Office, lump sum settlements were made by the Director General to cover both property loss and injuries to person in the same case and payments made thereon on the percentage basis above outlined. In cases where the Director General made lump sum settlements for all character of loss and did not indicate the amounts allowed for each item and they were not susceptible of segregation from the files of the Director General so that the property loss could be distinguished from other loss, the Comptroller General adopted an arbitrary ruling, as appears from the answer on page 9 of Mr. Turton's deposition as follows: "Where there was no evidence in the file which would permit or indicating a segregation of the injury or property loss there was a formula adopted by the Comptroller General which offered to make settlement upon the following basis: that was to pay the proportionate share of the uninsured loss as the amount of property loss bore to the property and injury loss claimed less the proportionate share of the amount previously paid under the Transportation Act of 1920."

It is conceded, of course, that no legal obligation existed for the appropriation of any money for the unpaid amounts on any claims in view of the fact that judgments had been entered and satisfied by the percentage payments referred to. The purpose of the act was for the "relief" of claimants by the payment of the balance of the loss which had been determined by the Director General or the courts to be due them. Did Congress then intend that those who suffered property loss only were to be paid, as contended by the plaintiff, or were all who suffered loss of whatsoever character to receive payments, as contended by the defendant. Statutes are to be construed to give effect to the intention of the legislature. "The intent of the legislature" is to be ascertained in the language of the statute itself, unless the language is so obscure, indefinite, or ambiguous that the effect intended by the legislature is left in doubt." Dunnell's Minnesota Digest, vol. 6, § 9840. Where words used in a statute are susceptible of different meanings, where reasonable minds may draw opposite conclusions, where the words in their use are not entirely clear, help may be received from the Congressional reports; and while it seems clear to me that the loss contemplated to be reimbursed by the terms of the Act intended payment of the claim involved in the case at bar, nevertheless divergent views exist as to what was meant, and since the stipulation of facts incorporates the Committee Reports as exhibits

and objection to their consideration was not preserved, I am of the opinion that it is a fitting situation to determine, insofar as possible, the intent of Congress in the passage of this remedial and beneficent legislation.

A reading of the Committee Reports leads me to the conclusion that no distinction in treatment was intended toward the various claimants and that all who suffered loss growing out of the fire, of whatsoever nature, the amount of whose loss had "been determined by court proceedings or by the Director General of Railroads" were to receive payment, after determination by the Comptroller General of all matters pertaining to payments as specified in the Act, all as ascertained from the records of the Director General of Railroads, which records shall be "conclusive evidence" of the amount of loss, person entitled to payment, amount paid by the United States with respect to such loss, and amount paid by any insurance company with respect thereto. I am unable to agree with the contention that the context of this Act limits the loss referred to to property loss.

"Where the terms of a statute are susceptible of more than one interpretation it is proper to consider the conditions with reference to the subject matter that existed when it was adopted, the occasion and necessity for the law and the causes which induced its enactment, or in other words the mischief sought to be avoided and the remedy intended to be afforded." 25 R.C. L. § 254.

"There is general acquiescence in the doctrine that the statements and opinions of legislators uttered in debates in Congress or in a state legislature are not appropriate sources of information from which to discover the meaning of the language of a statute passed by such body * * * but the court is at liberty to advert to the view expressed by individual members in debate or by a committee in its report and gather therefrom as from any other source the history of the times or of the evil which the legislation was intended to remedy." 25 R.C.L. §§ 269-270. See also Mennen Co. v. Federal Trade Comm., 2 Cir., 288 F. 774, 30 A.L.R. 1120; United States ex rel. Fazio v. Tod, 2 Cir., 285 F. 847; Duplex Printing Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196.

Government Exhibit "M" is a copy of House Report No. 2703, submitted on February 17, 1931, by Mr. Johnson of Nebraska to the Committee of the Whole House to accompany H.R. 5660, the first of the Bills introduced in aid of the fire sufferers here involved. Bills of like tenor were with modifications introduced at succeeding sessions of Congress until favorable action was taken. The so-called Johnson report was to a large degree the basis for ultimate favorable action on the bills introduced. In concluding its report the Committee very clearly expresses the purpose and intent of the Bill when it used the following language:

"The testimony developed in the hearings on this case is uncontroverted as to the situation which resulted in part payment of the losses suffered by the fire claimants. The testimony leads to the conclusion that the fire sufferers were practically forced to accept such payments as the Director General of Railroads was willing to make. When he made those part payments, it is true that the fire sufferers had no other alternative, except to comply with his pronouncements. He required that a legal release of all claims against the Government be executed; he required that a legal stipulation for the entry of judgment be executed; he required that a legal satisfaction of judgment be signed and executed. He took all of these steps so as to forever bar any claimant from having any legal or equitable causes of action against the United States in any of its courts. The only redress, therefore, which the claimants in this bill have is a bill in Congress.

"The Government is still indebted to them, in spite of these legal instruments, for the balance of a loss which was ascertained by the Government, on a liability that was established by the courts of Minnesota, and on which only partial payment has been made.

"The United States insists that its citizens discharge their duties and obligations fully. In collecting income taxes, it does not accept a percentage of the amount due. This Government should, therefore, recognize its just obligations, and, through Congress, ought to treat fairly with its citizens. Either the Government owed the fire sufferers the amount of loss which each of them sustained or else it owed them nothing. It recognized liability in making part payments on these claims. The only way that justice can be done is to pass this bill and pay the balance."

██ I am not unmindful of the rule that the administrative interpretation of a

statute by the executive department charged with its administration is entitled to the highest respect and should not be disturbed except for very cogent reasons. However, I am impelled to the conclusion that principles which suggest that a statute speaks for itself, and when judicially called in question the court must interpret it, regardless of previous administrative practice (Ass'n of Clerical Employees v. Brotherhood of R. & S. S. Clerks, 7 Cir., 85 F.2d 152, 109 A.L.R. 345); or where a statutory body has assumed a power plainly not granted, no amount of administrative interpretation is binding on the courts (Texas & Pac. Ry. v. United States, 289 U. S. 627, 53 S.Ct. 768, 77 L.Ed. 1410); and departmental regulations may not extend statute or modify its provisions (Campbell v. Galeno Chemical Co., 281 U.S. 599, 50 S.Ct. 412, 74 L.Ed. 1063)—apply in this case.

It would be difficult for me to believe that the law means or that Congress intended it to mean that one, for instance, who suffered the loss of a hand in the fire had no recourse under the law, but that if he had his out house burned up, that being a property loss, he would be entitled to the benefits of the Act.

"It is to be presumed that the legislature did not intend a law to work a hardship or injustice and it is a reasonable and safe rule of construction to resolve any ambiguity or absurdity in a statute in favor of a just and equitable operation of the law." 25 R.C.L. § 258.

 It is my view that Congress excluded fire-insurance companies from the benefits of the Act because it was not its policy to permit such companies to become subrogated to the claimants and be made whole for such amounts as were paid by them; that the farmers' mutuals were excepted from this exclusion on account of the fact that they are dependent for payment of their losses upon the collection of assets from their members, many of them fire sufferers; and there being no exception or restriction as to the payment of wrongful death or personal injury claims, the administrative officer or the court should not ingraft such restrictions upon the Act. Courts should be extremely cautious in reading an exception into a statute. Gollnik v. Mengel, 112 Minn. 349, 128 N.W. 292. "Where express exceptions are made the inference is a strong one that no other exceptions were intended." Street v. Chicago, M. & St. P. R. Co., 124 Minn. 517, 524, 145 N.W. 746, 749.

"It is well settled that an exception in a statute amounts to an affirmation of the application of its provisions to all other cases not excepted, and excludes all other exceptions." 25 R.C.L. § 230.

It is therefore my conclusion that the action of the Comptroller General in making the payment involved was correct and that no right of recovery therefor on the part of the plaintiff exists.