******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# WELLSWOOD COLUMBIA, LLC, ET AL.
## *v.* TOWN OF HEBRON
### (SC 19693)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa and Robinson, Js.*

*Syllabus*

The plaintiffs, who owned property in a town adjoining the defendant town, commenced the present action seeking to recover damages for, inter alia, a temporary taking, temporary nuisance, and tortious interference with business expectancies after the defendant's Board of Selectmen closed the road that provided the only access to the plaintiffs' property. The plaintiffs previously commenced an action seeking a temporary and permanent injunction, and the trial court rendered judgment in favor of the defendant. The plaintiffs appealed from that judgment to this court, which concluded that the defendant had exceeded its authority in closing the road and remanded the case to the trial court with direction to render judgment in favor of the plaintiffs. In the present action, the defendant moved for summary judgment on the basis of res judicata. The trial court granted the motion, concluding that the damages claims arose out of the same operative facts as the claim for injunctive relief in the first action. The plaintiffs appealed, claiming that the trial court incorrectly determined that their damages claims in the present action were barred by the principles of res judicata. *Held*:

1. The plaintiffs' argument that their takings claim did not accrue and thus could not have been brought until after the injunction had been issued in the first action was unavailing; a temporary takings claim accrues when the regulatory action that is alleged to have effected the taking becomes final, and the accrual of the plaintiffs' takings claim was not postponed for res judicata purposes by virtue of the fact that the extent of their damages was uncertain because the permanent or temporary nature of the taking was unknown, as it was clear at the time the road was closed that the plaintiffs had sustained some damages.

2. The road closure did not constitute a temporary nuisance or continuing wrong such that the plaintiff's damages claim fell within the exception to res judicata for continuing or recurrent wrongs: the plaintiffs did not allege that the defendant committed additional, wrongful acts during or subsequent to the injunction action but, rather, claimed that they were entitled to recover damages on the basis of the defendant's single, wrongful act of closing the road; moreover, even if the road closure was properly characterized as a nuisance, because it was the sort of harm that the plaintiffs were required to presume would continue indefinitely, it would have been a permanent nuisance for which the cause of action would have accrued upon the closure of the road.

3. The trial court properly granted the defendant's motion for summary judgment with respect to the plaintiffs' claim for tortious interference with business expectancies, there having been no genuine issue of material fact as to whether the plaintiffs sustained losses prior to the commencement of the first action; the plaintiffs having lost access to their property and having presented expert testimony in the first action regarding the diminution in value of that property, it was apparent that the plaintiffs had suffered immediate and cognizable losses resulting from the closure of the road, and, therefore, the trial court properly concluded that the claim for tortious interference with business expectancies could have been brought in the prior action.

4. The policies underlying res judicata strongly supported the doctrine's application in the present case, as allowing this case to proceed would run counter to the minimization of repetitive litigation, the promotion of judicial economy, and repose to the parties: although further proceedings as to the damages claims would have been required following this court's reversal of the trial court's judgment in the first action, those proceedings would have concluded several years ago and would have conserved the considerable resources expended by the parties and the court in that time; moreover, the plaintiffs would have been aggrieved for purposes of an appeal even if they had requested both injunctive

relief and damages in the first action and the trial court denied their request for an injunction but awarded damages.

Argued January 25—officially released November 7, 2017

*Procedural History*

Action to recover damages for the defendant's allegedly improper temporary closure of a public road, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the case was removed to the United States District Court for the District of Connecticut, which retained jurisdiction over certain of the plaintiffs' claims and remanded certain of the plaintiffs' claims to the Superior Court in the judicial district of Hartford; thereafter, the court, *Elgo, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiffs appealed. *Affirmed.*

*Kerry M. Wisser*, with whom, on the brief, was *Sarah Black Lingenheld*, for the appellants (plaintiffs).

*Thomas R. Gerarde*, with whom, on the brief, was *Emily E. Holland*, for the appellee (defendant).

*Opinion*

PALMER, J. In *Wellswood Columbia, LLC* v. *Hebron*, 295 Conn. 802, 804–805, 825, 992 A.2d 1120 (2010) (*Wellswood I*), this court reversed the judgment of the trial court, which denied the application of the plaintiffs, Wellswood Columbia, LLC (Wellswood), and its managing partner, Ronald Jacques, for a permanent injunction barring the defendant, the town of Hebron (town),[1] from closing a road that provided the sole existing access to a property that Wellswood owned in the adjoining town of Columbia. Shortly after the trial court issued the injunction upon remand from this court, the plaintiffs commenced the present action against the town seeking damages for, inter alia, a temporary taking, temporary nuisance and tortious interference with the plaintiffs' business expectancies. The trial court, *Elgo, J.*, granted the town's motion for summary judgment on the ground that the plaintiffs' claims were barred by the doctrine of res judicata because they arose out of the same operative facts as the plaintiffs' claim for injunctive relief and, therefore, should have been brought in *Wellswood I*. On appeal,[2] the plaintiffs claim that the trial court incorrectly determined that their claims in the present action are barred by the principles of res judicata. We disagree and, accordingly, affirm the judgment of the trial court.[3]

I

FACTS AND PROCEDURAL HISTORY

This court's opinion in *Wellswood I* sets forth the following relevant facts and procedural history. "In early 2004, the plaintiffs were considering the purchase of the property, which consisted of approximately 188 acres of land in the town of Columbia, for purposes of constructing a six phase residential retirement community. The only . . . existing access to the property [was] Wellswood Road in Hebron,[4] which runs from Route 66 to the town line between Hebron and Columbia. At that point, Wellswood Road becomes Zola Road, which continues into the property and terminates in a dead end. . . .

"Because the only access to the property was by way of Wellswood Road, the plaintiffs requested a meeting with Hebron town officials to discuss the proposed development. During a meeting on April 21, 2004, Hebron town officials expressed several concerns about the proposed development, including concerns about storm water runoff from Wellswood Road, the adequacy of the water supply and the feasibility of septic services. The parties also discussed whether access to the property would be through private or public roads. . . . Hebron town officials indicated that, because the sole access to the development, at least initially, would be Wellswood Road, the development did not comply with that town's subdivision regulations.

"After several additional meetings with the Hebron town officials to discuss the development, Wellswood purchased the property in August, 2004, and decided to go forward with its development plans despite knowing of [those] concerns. In October, 2004, the plaintiffs began the subdivision approval process in Columbia. On December 9, 2004, Paul Mazzaccaro, then the town manager for Hebron, sent a letter to the Columbia [P]lanning and [Z]oning [C]ommission in which he raised several concerns regarding the proposed development. Mazzaccaro stated that, as depicted in the plans that the plaintiffs had submitted, the proposed development 'never could have access to other . . . development [in Columbia] or be connected to the present Columbia street system.' He requested that future plans provide for such connection. Thereafter, the plaintiffs met separately with officials of both towns and it was determined that Mazzaccaro's letter had been based on outdated plans. Later subdivision plans showed several proposed new streets running from Zola Road to the property line. None of these streets, however, connected with existing roads in Columbia.

"Over the next several months, the plaintiffs continued the subdivision approval process in Columbia. On September 13, 2005, the Columbia [P]lanning and [Z]oning [C]ommission conducted a public hearing on the proposed subdivision. Several town officials from Hebron attended the hearing and voiced concerns over the remote location of the subdivision, the difficulty of responding to emergencies at that location, the effect of additional traffic on the safety of Wellswood Road and the increased cost to Hebron of maintaining the road and providing emergency services.

"On October 6, 2005, the Hebron [P]lanning and [Z]oning [C]ommission held a special meeting and recommended closing and barricading Wellswood Road at the town line. The Hebron [B]oard of [S]electmen adopted the recommendation that night. Thereafter, the plaintiffs brought [an] action seeking a temporary and permanent injunction to prevent [Hebron] from closing Wellswood Road. After the plaintiffs filed the action, [Hebron] . . . posted a 'road closed' sign at the end of Wellswood Road. [Hebron] then filed a motion to dismiss the action for lack of subject matter jurisdiction, claiming, inter alia, that the plaintiffs' lacked standing, which the trial court, *Peck*, *J.*, denied.

"In April, 2006, the town of Columbia approved the plaintiffs' subdivision application. The parties subsequently entered into a stipulation for a temporary injunction pursuant to which the town of Hebron was enjoined from obstructing the plaintiffs' use of Wellswood Road for access to their property pending resolution of the action. Thereafter, the action was tried to the court, *Hon. Lawrence C. Klaczak*, judge trial referee . . . ." (Footnotes altered.) *Wellswood Columbia, LLC*

v. *Hebron*, supra, 295 Conn. 805–808.

On July 21, 2008, the trial court issued a memorandum of decision in which it concluded, inter alia, that the plaintiffs were not entitled to a permanent injunction because they had failed to demonstrate that they were without an adequate remedy at law or that they would suffer irreparable harm in the absence of an injunction.[5] *Wellswood Columbia, LLC* v. *Hebron*, Superior Court, judicial district of Tolland, Docket No. TTD-CV-05-4003914-S (July 21, 2008) (46 Conn. L. Rptr. 69, 76), rev'd, 295 Conn. 802, 992 A.2d 1120 (2010). In reaching its determination, the trial court noted that "the plaintiffs have argued that they have suffered irreparable harm because [the town's] actions have injured them in such a way that money damages cannot compensate them. However, the plaintiffs have contradicted this position through the evidence they provided at trial, namely, the expert testimony of their appraiser. While this fact may preclude them from seeking injunctive relief, it does not prevent them from seeking money damages. Yet, in order to recover such money damages . . . the plaintiffs must show a total and permanent loss of the right of access to public roads, and presently the plaintiffs have failed to prove such a loss based on the evidence presented at trial." (Emphasis omitted; internal quotation marks omitted.) Id., 74.[6]

"Furthermore, the plaintiffs have not demonstrated that they are without an adequate remedy at law. [On the basis of] their allegations, the plaintiffs could have sought damages based on a taking[s] theory of recovery, yet they chose not to seek such a remedy in their prayer for relief or otherwise during the course of this litigation. While both parties provided expert appraisal testimony at trial, each [appraiser] provided significantly different opinions regarding the diminution of value resulting from the closure of Wellswood Road, such evidence was presented with respect to the issue of irreparable harm, not money damages. This court disagrees with the plaintiffs' assertion that the availability of money damages is not relevant to determining whether an adequate remedy at law exists. . . . Based on the expert appraisal testimony of the parties, the legal remedy of money damages would be available to the plaintiffs . . . as each appraiser testified to specific estimates of economic loss that would result from the closure of Wellswood Road. Because both parties provided expert testimony that offered specific amounts of compensable injury, the court finds that the plaintiffs have not sufficiently demonstrated that they are without an adequate remedy at law, and as such, an injunction should not issue in the present action." Id.

Finally, the trial court observed that "the plaintiffs argue in their [post trial] brief that, should the court find [that] injunctive relief is not the proper remedy . . . they are entitled to money damages and a tempo-

rary injunction until such damages are paid . . . ." Id., 76 n.2. The court explained, however, that "the plaintiffs have not provided sufficient evidence on this issue. In fact, this alternative theory of recovery was never brought up in any of the plaintiffs' pleadings, nor in their prayer for relief. Because they have failed to properly bring this issue before the court, the issue of money damages will not be addressed; the only issue presently before the court is whether the plaintiffs are entitled to injunctive relief." Id.

On appeal to this court in *Wellswood I*, the plaintiffs challenged the trial court's denial of their request for a permanent injunction but not the court's denial of their request for damages. Specifically, the plaintiffs argued that the trial court "improperly denied their request for a permanent injunction barring the [town] from closing Wellswood Road because: (1) barring the road was an unreasonable and arbitrary exercise of police power; (2) equitable relief is an appropriate remedy for the destruction of access even without a showing of irreparable harm; (3) even if a showing of irreparable harm is required, the plaintiffs were irreparably harmed by the road closure because there is no other access to the property; (4) the road closure was inconsistent with the public policy underlying General Statutes § 13a-55; and [5] contrary to the trial court's finding, the plaintiffs cannot use the property for purposes other than the subdivision if the road is closed." (Footnote omitted.) *Wellswood Columbia, LLC* v. *Hebron*, supra, 295 Conn. 808–809. We agreed with the plaintiffs' first contention, concluding that the town had exceeded its authority in closing Wellswood Road; id., 809; and, therefore, that "the resolution of the [town's] [B]oard of [S]electmen to close and barricade Wellswood Road was void ab initio . . . ." Id., 824. Accordingly, we remanded the case to the trial court with direction to "render judgment in favor of the plaintiffs . . . voiding the . . . action of the [town's] [B]oard of [S]electmen adopting the recommendation of the [town's] [P]lanning and [Z]oning [C]ommission to close and barricade Wellswood Road." Id., 824–25.

In reaching our determination, we rejected the town's contention that the plaintiffs were not aggrieved by its decision to close the road, and, therefore, the plaintiffs lacked standing to bring the injunction action. Id., 809, 813. We concluded that the plaintiffs were classically aggrieved by the town's decision because they had established a specific personal and legal interest that had been injuriously affected by the town's actions. In particular, we explained that, "[i]n the course of exercising the powers expressly granted to it, such as the power to discontinue a road and to lay out a new road, a municipality may deprive a landowner of an access easement"; (footnotes omitted) id., 815; but, "in such cases, the elimination of the access easement constitutes a constitutional taking entitling the landowner

to compensation." Id., 815 n.16.

Shortly after the trial court issued the injunction, as directed by this court on remand, the plaintiffs brought the present action seeking damages for, inter alia, a temporary taking. In their complaint, the plaintiffs alleged that, as a result of the temporary closure of Wellswood Road, "[they] were prevented from developing the property and deprived of the economic value and income to be derived from the property and from [the] development. When the . . . [t]own . . . posted and maintained the 'road closed' sign, it knew or should have known that any potential buyer with respect to [the residential retirement community] would become aware of the 'road closed' sign, and that [the] sign would have the effect of driving away potential buyers with respect to [the residential retirement community]." Thereafter, the town removed the case to the United States District Court for the District of Connecticut, and that court, Bryant, J., subsequently dismissed two of the plaintiffs' federal claims, retained jurisdiction over a bad faith takings claim, and remanded the plaintiffs' temporary takings, temporary nuisance and tortious interference with business expectancies claims to the Superior Court.

Following remand to the Superior Court, the town moved for summary judgment, arguing, inter alia, that the plaintiffs' claims were barred by the doctrine of res judicata and the applicable statutes of limitations. The trial court, *Elgo, J.*, granted the town's motion, concluding that all of the plaintiffs' claims arose out of the same operative facts as the plaintiffs' claim for injunctive relief, and, therefore, the plaintiffs' claims should have been brought in *Wellswood I.* After oral argument in this court, the District Court reached a similar conclusion with respect to the plaintiffs' bad faith takings claim and granted summary judgment in favor of the town with respect to that claim. See *Wellswood Columbia, LLC* v. *Hebron*, United States District Court, Docket No. 3:10-CV-1467 (VLB) (D. Conn. March 28, 2017).

On appeal, the plaintiffs argue that their takings and tortious interference with business expectancies claims are not barred by res judicata because they did not accrue until the town reopened the road following this court's decision in *Wellswood I.* In support of this claim, the plaintiffs maintain that, until the reopening of the road, the full extent of their damages could not be established with reasonable certainty. The plaintiffs further argue that the road closure constituted a private temporary or "continuing" nuisance,[7] and, as such, their damages claim falls within the exception to res judicata for "continuing or recurrent wrong[s]." 1 Restatement (Second), Judgments § 26 (1) (e), p. 234 (1982).[8] In the alternative, the plaintiffs argue that the policies underlying the doctrine of res judicata, in particular,

the policy of judicial economy, are not furthered by the doctrine's application in the present case. The plaintiffs' claim, among other reasons, that damages could not have been assessed in *Wellswood I* until this court ruled, in 2010, on the propriety of the town's conduct and, therefore, even if the plaintiffs had brought all of their claims in the earlier action, "[t]he remand order from this court would have been . . . for a hearing in damages for the temporary taking." Thus, according to the plaintiffs, because further proceedings would have been required, even if they had brought all of their claims in *Wellswood I*, allowing the present case to proceed would work no real violence on the doctrine of res judicata.

We conclude that the plaintiffs' claims are foreclosed by principles of res judicata that are well established in Connecticut law, and that the out-of-state cases on which the plaintiffs rely provide no compelling reason to deviate from those principles so as to exempt their claims from the preclusive effect of res judicata. To the contrary, as we explain more fully hereinafter, the present case falls squarely within the parameters of that doctrine and its jurisprudential underpinnings.

## II

### GOVERNING LEGAL PRINCIPLES

It has long been an "established principle in our law of civil procedure that two [actions] shall not be brought for the determination of matters in controversy between the same parties, whether relating to legal or equitable rights, or to both, when such determination can be had as effectually and properly in one [action]. . . . To this end the law provides that all courts having jurisdiction at law and in equity, may administer legal and equitable rights, and apply legal and equitable remedies in favor of either party, in one and the same [action], so that legal and equitable rights of the parties may be enforced and protected in one action." (Internal quotation marks omitted.) *Beach* v. *Beach Hotel Corp.*, 117 Conn. 445, 452–53, 168 A. 785 (1933).

"The doctrine of res judicata holds that an existing final judgment rendered [on] the merits without fraud or collusion, by a court of competent jurisdiction, is conclusive of causes of action and of facts or issues thereby litigated as to the parties and their privies in all other actions in the same or any other judicial tribunal of concurrent jurisdiction. . . . If the same cause of action is again sued on, the judgment is a bar with respect to any claims relating to the cause of action [that] were actually made or [that] might have been made. . . .

"The applicability of the [doctrine] of . . . res judicata presents a question of law that we review de novo. . . . Because [the doctrine is a] judicially created [rule] of reason that [is] enforced on public policy grounds;

*Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, 248 Conn. 108, 127, 728 A.2d 1063 (1999); we have observed that whether to apply [the] doctrine in any particular case should be made based [on] a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close . . . and the competing interest of the plaintiff in the vindication of a just claim. . . . These [underlying] purposes are generally identified as being (1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments [that] undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation. . . . The judicial [doctrine] of res judicata . . . [is] based on the public policy that a party should not be able to relitigate a matter [that] it already has had an opportunity to litigate. . . . Stability in judgments grants to parties and others the certainty in the management of their affairs [that] results when a controversy is finally laid to rest. . . .

"We also have recognized, however, that the application of [the] doctrine has dramatic consequences for the party against whom it is applied, and that we should be careful that the effect of the doctrine does not work an injustice. . . . Thus, [t]he [doctrine] . . . should be flexible and must give way when [its] mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." (Citations omitted; internal quotation marks omitted.) *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 600–602, 922 A.2d 1073 (2007).

"Because the operative effect of the principle of [res judicata] is to preclude relitigation of the original claim, it is crucial to define the dimensions of that original claim. The Restatement (Second) [of Judgments] provides, in § 24, that the claim [that is] extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual grouping constitutes a transaction, and what groupings constitute a series, are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. In amplification of this definition of original claim, § 25 of the Restatement (Second) [of Judgments provides] that [t]he rule of § 24 applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action (1) [t]o present evidence or grounds or theories of the case not presented in the first action, or (2) [t]o seek remedies or forms

of relief not demanded in the first action.

"The transactional test of the Restatement [(Second) of Judgments] provides a standard by which to measure the preclusive effect of a prior judgment, which we have held to include any claims relating to the cause of action [that] were actually made or might have been made. . . . In determining the nature of a cause of action for these purposes, we have long looked to the group of facts [that] is claimed to have brought about an unlawful injury to the plaintiff . . . and have noted that [e]ven though a single group of facts may give rise to rights for several different kinds of relief, it is still a single cause of action. . . .

"The Restatement (Second) of Judgments further explains, with respect to how far the witnesses or proof in the second action would tend to overlap the witnesses or proof relevant to the first, [i]f there is a substantial overlap, the second action should ordinarily be held precluded. But the opposite does not hold true; even when there is not a substantial overlap, the second action may be precluded if it stems from the same transaction or series. 1 Restatement (Second), [supra] § 24, comment (b) . . . ."[9] (Internal quotation marks omitted.) *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, 300 Conn. 325, 348–49, 15 A.3d 601 (2011).

### III

### THE PLAINTIFFS' CLAIMS

With these principles in mind, we turn to the merits of the plaintiffs' claims. Specifically, they contend that their damages claims—for a temporary taking, temporary nuisance and tortious interference with the plaintiffs' business expectancies—do not fall within the purview of the doctrine of res judicata. The plaintiffs' further contend that, even if principles of res judicata are generally applicable to their claims, we should exempt them from the preclusive effect of that doctrine because its underlying policies would not be served in the present case. We reject these contentions.

### A

### Temporary Taking

The plaintiffs first argue that res judicata does not apply to their temporary takings claim because it did not accrue, and, therefore, could not have been brought, until this court issued its opinion in *Wellswood I*. They claim that, until then, neither the extent of their damages nor the nature of the taking—whether temporary or permanent—was known. At oral argument before this court, however, counsel for the plaintiffs conceded that this contention is contrary to this court's decision in *Cumberland Farms, Inc.* v. *Groton*, 247 Conn. 196, 210–13, 719 A.2d 465 (1998), which held that a temporary takings claim accrues and is capable of resolution

on the merits when the regulatory action that is alleged to have effectuated a taking becomes final. In *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 952 A.2d 1 (2008), this court explained the holding in *Cumberland Farms, Inc.*, as follows: "In *Cumberland Farms, Inc.* v. *Groton*, supra, 198–99, a plaintiff landowner brought an inverse condemnation action against a municipality, arguing that the municipality's denial of a variance had destroyed the value of the plaintiff's real property and, therefore, that the plaintiff was entitled to just compensation for the regulatory taking of that property. The Appellate Court concluded that the inverse condemnation action had been brought prematurely because the plaintiff's administrative appeal from the denial of its variance request remained pending, and, consequently, the extent of its damages was unknown. . . . We disagreed and reversed the decision of the Appellate Court. . . . Specifically, we disagreed that the fact that the plaintiff potentially could prevail in the administrative appeal, thereby eliminating its right to damages, rendered the plaintiff's takings claim speculative. . . . We reasoned that, even if the plaintiff's administrative appeal ultimately was successful, the plaintiff still would be entitled to some compensation for the temporary taking it had suffered during the pendency of that appeal.[10] . . . In other words, even though it was unclear at the outset of the inverse condemnation action whether the plaintiff's damages claim was for a temporary or complete taking, the claim nevertheless was ripe and capable of resolution on the merits." (Citations omitted; footnote added.) *Chapman Lumber, Inc.* v. *Tager*, supra, 88; see also *Miller* v. *Westport*, 268 Conn. 207, 216, 842 A.2d 558 (2004) (explaining that, under *Cumberland Farms, Inc.*, "the denial of a variance by a zoning board of appeals is considered a final decision by an initial decision maker, which is all that is required to establish finality in order to bring a takings claim, and that once the zoning board of appeals makes its decision, the regulatory activity is final for purposes of an inverse condemnation claim").

Thus, under controlling case law, the mere fact that the extent of the plaintiffs' damages was not immediately known at the time of the taking—because the plaintiffs did not know whether the taking would be temporary or permanent—does not operate to postpone the accrual of the plaintiffs' takings claim for res judicata purposes. This is so because, "[a]lthough the exact amount of the [plaintiffs'] damages might have remained uncertain when [they] commenced [the first] action, it nevertheless was abundantly clear that the plaintiff[s] had sustained some damages . . . . Pursuant to Connecticut's ripeness jurisprudence, as long as it is clear that [the plaintiffs have] suffered an injury sufficient to give rise to the cause of action alleged, a lack of certainty as to the precise scope of damages will not prevent the claim from being justiciable."

(Emphasis omitted; footnote added.) *Chapman Lumber, Inc.* v. *Tager*, supra, 288 Conn. 87–88. As far as we are aware, this is the law throughout the country. See, e.g., *Navajo Nation* v. *United States*, 631 F.3d 1268, 1278 (Fed. Cir. 2011) ("[t]his court has previously rejected the notion that the cessation of [a] regulation is a necessary condition to liability of the United States for a temporary regulatory takings claim" [internal quotation marks omitted]); *Bass Enterprises Production Co.* v. *United States*, 133 F.3d 893, 896 (Fed. Cir. 1998) ("[t]he fact that regulation has not ceased may complicate a determination of just compensation but does not justify a bright-line rule against liability"); *Kuhnle Bros., Inc.* v. *Geauga*, 103 F.3d 516, 521 (6th Cir. 1997) ("In the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value of the property or has effected a transfer of a property interest. This is a single harm, measurable and compensable when the statute is passed." [Internal quotation marks omitted.]); *Scott* v. *Sioux City*, 432 N.W.2d 144, 147–48 (Iowa 1988) (inverse condemnation resulting from zoning ordinance restricting development is not continuing injury but is single injury compensable at time of ordinance's passage); *Chesterfield Village, Inc.* v. *Chesterfield*, 64 S.W.3d 315, 320–21 (Mo. 2002) (second action by plaintiff for temporary taking and damages after prevailing in first action for injunctive relief was barred by res judicata, as "[t]he fact that [the plaintiff] did not know at [time of the first action] precisely what its damages would be is of little importance"); *Raab* v. *Avalon*, 392 N.J. Super. 499, 513, 921 A.2d 470 (App. Div.) (concluding that taking was complete when defendant town took possession of shoreline property after storm and built dunes by passing various ordinances, and that there was no basis in fact for applying continual wrong doctrine "to rescue plaintiffs from the legal consequences of their deliberate inactions"), cert. denied, 192 N.J. 475, 932 A.2d 26 (2007).

Consistent with the foregoing principles, the Appellate Court, in *Buck* v. *Berlin*, 163 Conn. App. 282, 293, 135 A.3d 1237, cert. denied, 321 Conn. 922, 138 A.3d 283 (2016), concluded that a takings claim predicated on the defendant town's placement of a gate across a road that provided the sole access to the land of the plaintiff property owners was barred by res judicata because the property owners, in an earlier injunction action, had sought to enjoin the town from blocking the road. In *C & H Management, LLC* v. *Shelton*, 140 Conn. App. 608, 615–16, 59 A.3d 851 (2013), the Appellate Court similarly concluded that a temporary takings claim was barred by res judicata when the plaintiff management company previously had brought a successful mandamus action to compel the defendant city to issue a building permit on a particular parcel of land. The Appellate Court concluded that, because the

damages action arose out of the same operative facts as the mandamus action—the city's refusal to issue the building permit—the management company should have brought its takings claim in the prior action. Id., 617 ("[w]e are aware of no case law in this state that allows a subsequent action for damages to be maintained, despite the doctrine of res judicata, simply because the first action sought only a writ of mandamus"); see also *Creek* v. *Westhaven*, 80 F.3d 186, 190 (7th Cir.) ("You cannot split a claim into a request for damages and a request for injunction and litigate each in a separate [action]. . . . [1 Restatement (Second), supra, § 24 (1) and comment (a), p. 197]. To divide a claim in that way is precisely the vice against which the doctrine of res judicata . . . is directed." [Citations omitted.]), cert. denied, 519 U.S. 868, 117 S. Ct. 180, 136 L. Ed. 2d 120 (1996).

In arguing to the contrary, the plaintiffs rely on two federal circuit court cases, *Corn* v. *Lauderdale Lakes*, 904 F.2d 585, 587–88 (11th Cir. 1990), and *Creppel* v. *United States*, 41 F.3d 627, 632 (Fed. Cir. 1994), both of which concluded that a temporary takings claim did not accrue until there was a final *judicial* determination of the validity of the regulatory action alleged to have effectuated the taking. Neither of these cases constitutes persuasive precedent.

In *Corn* v. *Lauderdale Lakes*, supra, 904 F.2d 585, the United States Court of Appeals for the Eleventh Circuit determined that, for purposes of res judicata, a temporary takings claim "is not mature until the propriety or impropriety of the zoning regulation has been finally determined [by the courts]." Id., 587. Subsequently, however, in *New Port Largo, Inc.* v. *Monroe County*, 985 F.2d 1488, 1497, 1499 (11th Cir.), cert. denied, 510 U.S. 964, 114 S. Ct. 439, 126 L. Ed. 2d 373 (1993), Chief Judge Gerald Tjoflat and Judge James Edmondson acknowledged that *Corn* was flawed to the extent that it purported to hold that a temporary takings claim does not accrue until the propriety of the regulatory action has been adjudicated.[11] In a concurring opinion, Chief Judge Tjoflat explained that the court in *Corn* had misinterpreted language in *Williamson County Regional Planning Commission* v. *Hamilton Bank*, 473 U.S. 172, 186, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985) (*Williamson*), that a temporary takings claim accrues when the decision maker "charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue . . . ." (Internal quotation marks omitted.) *New Port Largo, Inc.* v. *Monroe County*, supra, 1495 (Tjoflat, C. J., concurring). As Chief Judge Tjoflat explained, "[t]he [court in] *Corn* . . . erred by improperly expanding *Williamson*'s final decision requirement so that accrual is postponed until 'state review entities'— rather [than] the initial [decision makers]—'have made a final determination on the status of the subject prop-

erty.' . . . Hence, under *Williamson*, a federal takings claim ripens as soon as the initial [decision maker] renders a final decision. . . . Indeed, *Williamson* specifically rejected the notion that plaintiffs must exhaust state review procedures before their takings claims ripen." (Citations omitted; footnotes omitted.) Id., 1497 (Tjoflat, C. J., concurring).

In a separate concurring opinion, Judge Edmondson, the author of the opinion in *Corn*, similarly acknowledged that Chief Judge Tjoflat's criticisms of *Corn* were valid but maintained that the decision was nevertheless correct on its facts and in light of the issue presented therein, which did not require a determination of when a claim accrues but, rather, when the applicable statute of limitations began to run. Id., 1499 (Edmondson, J., concurring) ("Most important, *Corn* . . . did not decide [because it was unnecessary to decide] when [the plaintiff's] taking claim first became ripe or mature for federal adjudication. Anything the language of the *Corn* . . . [decision] may imply about maturity or ripeness [the *Williamson* kind of issue] for [that] claim is [dictum]." [Footnote omitted.]); see also id., 1501–1502 (Edmondson, J., concurring) ("As a jurisprudential matter, the doctrine of ripeness rests on different considerations than do statutes of limitation[s]. . . . And it is not strange that a matter may become ripe and yet the statute does not start to run.").

The plaintiffs also rely on *Creppel* v. *United States*, supra, 41 F.3d 627, in which the United States Court of Appeals for the Federal Circuit stated that "property owners cannot [commence an action] for a temporary taking until the regulatory process that began it has ended. This is because they would not know the extent of their damages until the [g]overnment completes the 'temporary' taking. Only then may property owners seek compensation." Id., 632. It is impossible to square this language—which some courts have dismissed as dictum[12]—with later cases from the Federal Circuit, which uniformly hold that a regulatory takings claim is ripe for adjudication upon a final decision of the regulatory authority.[13] See, e.g., *Navajo Nation* v. *United States*, supra, 631 F.3d 1278 ("[The] court has previously rejected the notion 'that the cessation of [a] regulation is a necessary condition to liability' . . . for a temporary regulatory takings claim. [*Bass Enterprises Production Co.* v. *United States*, supra, 133 F.3d 896 (Fed. Cir. 1998)]; see also *First English Evangelical Lutheran Church* v. *Los Angeles*, 482 U.S. 304, 320, 107 S. Ct. 2378, 96 L. Ed. 2d 250 [1987] ['It would require a considerable extension of [earlier Supreme Court] decisions to say that no compensable regulatory taking may occur until a challenged ordinance has ultimately been held invalid.' . . . ]. In *Bass* [*Enterprises Production Co.*], for example, [the court] explicitly rejected the argument that a plaintiff was required to wait until a regulation was no longer in effect before bringing a temporary

regulatory takings claim."); *Caldwell* v. *United States*, 391 F.3d 1226, 1234 (Fed. Cir. 2004) ("[i]t is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues"), cert. denied, 546 U.S. 826, 126 S. Ct. 366, 163 L. Ed. 2d 72 (2005); see also *Kemp* v. *United States*, 65 Fed. Cl. 818, 824 (2005) (rejecting plaintiff's claim that statute of limitations for taking was tolled because, "until the property was sold, she had no way of knowing when the period as to which she was entitled to compensation would end"); *Kemp* v. *United States*, supra, 823 ("Plaintiff [property owner] argues that the temporary taking must end before an owner can seek compensation, but that theory has been held invalid: even if the claim were properly viewed as a regulatory taking, the regulation that results in a taking does not have to cease for a finding of a temporary taking"). Accordingly, insofar as the plaintiffs contend that their temporary takings claim could not have been brought with their claim for injunctive relief because it had not yet accrued, Connecticut law belies that contention, and we find unpersuasive the out-of-state authority on which the plaintiffs rely.

B

Temporary Nuisance

We also do not agree with the plaintiffs that the road closure constituted a temporary private nuisance—or any other type of continuing or recurrent wrong—such that their damages claim falls within the exception to res judicata for continuing or recurrent wrongs, as set forth in § 26 (1) (e) of the Restatement (Second) of Judgments. Pursuant to that exception, in cases of "continuing or recurrent wrong[s]," a plaintiff may commence an action "from time to time for the damages incurred to the date of [that action]" without running afoul of res judicata's prohibition against seeking additional damages after the original action. 1 Restatement (Second), supra, § 26 (1) (e), p. 234. The continuing or recurrent wrongs exception accords with the principle that "[m]aterial operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first." 1 Restatement (Second), supra, § 24, comment (f), p. 203; see also *Marone* v. *Waterbury*, 244 Conn. 1, 15 n.14, 707 A.2d 725 (1998).

The plaintiffs cite two cases for the proposition that the road closure constituted a continuing wrong such that every day that the road remained closed constituted a new injury. They first cite *Gordon* v. *Warren*, 579 F.2d 386 (6th Cir. 1978), in which the United States Court of Appeals for the Sixth Circuit applied the continuing violations doctrine[14] in concluding that a temporary takings claim was not time barred because the alleged

wrong—a city ordinance that prevented a developer from completing construction of an apartment complex—was a "continuing course of action [that] made it impossible for the plaintiffs to enjoy the full use of their property . . . ." Id., 387, 391. As the United States Court of Appeals for the Third Circuit later explained, however, the Sixth Circuit has not followed *Gordon*; see *Cowell* v. *Palmer*, 263 F.3d 286, 293 (3d Cir. 2001); see also *Kuhnle Bros., Inc.* v. *Geauga*, supra, 103 F.3d 521 n.4; and other federal circuit courts of appeals have also declined to adhere to *Gordon*'s holding. See, e.g., *Ocean Acres Ltd. Partnership* v. *Board of Health*, 707 F.2d 103, 106 (4th Cir. 1983).

Courts have not adopted the approach utilized in *Gordon* because that methodology conflates the continuation of unlawful acts with the continued ill effects of a single unlawful act, for example, the passage of an ordinance halting construction of an apartment complex. See, e.g., *Trzebuckowski* v. *Cleveland*, 319 F.3d 853, 858 (6th Cir. 2003) (explaining distinction between continuing violation and continuing effect of prior violation that was alleged to have effected taking); *Cowell* v. *Palmer*, supra, 263 F.3d 293 ("[t]he focus of the continuing violations doctrine is on affirmative acts of the [defendant municipality]," which do not include the "mere existence of [municipal] liens" or the refusal to remove them); *Kuhnle Bros., Inc.* v. *Geauga*, supra, 103 F.3d 521 ("In the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value of the property or has effected a transfer of a property interest. This is a single harm, measurable and compensable when the statute is passed." [Internal quotation marks omitted.]); *Ocean Acres Ltd. Partnership* v. *Board of Health*, supra, 707 F.2d 106 (adoption of septic tank ban was not continuing violation); *Gallegos* v. *Battle Creek*, Docket No. 1:10-CV-448, 2012 WL 1033693, *15 (W.D. Mich. March 1, 2012) (noting criticism of *Gordon* and emphasizing "the subtle difference between a continuing violation and a continuing effect of a prior violation" [internal quotation marks omitted]); *Bettendorf* v. *St. Croix*, 679 F. Supp. 2d 974, 978 (W.D. Wis. 2010) ("the adoption of an ordinance has immediate economic consequences for a land owner; the time for challenging it was within the state period of limitations"), aff'd, 631 F.3d 421 (7th Cir. 2011); see also *Wellswood Columbia, LLC* v. *Hebron*, supra, United States District Court, Docket No. 3:10-CV-1467 (VLB) (plaintiffs "suffered the continued ill effects of the single act of closing Wellswood Road" rather than continuing unlawful acts necessary to demonstrate a continuing violation); *Scott* v. *Sioux City*, supra, 432 N.W.2d 148 ("[T]he cause of action arises out of the enactment of a land use regulation, not a continuing nuisance or trespass. Although damages for flooding and physical invasion can occur intermittently over the passage of time, in this case, the passage of the

permanent ordinance had immediate adverse economic consequences for [the] plaintiffs. The regulation's impact on the development potential and market value of the property was immediate, and constituted a single injury.").

The plaintiffs also rely on *Creek* v. *Westhaven*, supra, 80 F.3d 186, in which the United States Court of Appeals for the Seventh Circuit held that an earlier injunction action in state court did not bar a second action in federal court for damages when the defendant Village of Westhaven, Illinois (Westhaven), allegedly "wishing to keep [Westhaven] white," had denied the plaintiff developer's application for a permit to build low income housing. Id., 188, 191. In the first action, the court granted the developer's request for an injunction ordering Westhaven to issue the permit. Id., 189. Westhaven, however, refused to comply with that order and continued to engage in what the court described as an alleged racially motivated campaign to defeat the housing development, which included "acting in cahoots" with a local homeowners association "to invalidate [federal] approval of rent support for [the] development." Id. In disagreeing with the District Court that the second action was barred by principles of res judicata, the Seventh Circuit held that the continuing wrongs exception to res judicata was applicable. The court reasoned, inter alia, that res judicata did not foreclose the developer's claims in the second action because they were predicated in part on wrongful acts committed after the final resolution of the injunction action. Id., 191. The court further reasoned that the second action was not barred because, at the time of the injunction action, the developer could not know when, if ever, Westhaven would relent and issue the permit, such that the developer also had no way of estimating his full damages. Id., 190.

The present case is readily distinguishable from *Creek* on many levels, most notably, for our purposes, because the plaintiffs do not allege that the town committed any additional unlawful acts during or subsequent to the injunction action. Rather, all of the plaintiffs' claims are predicated on a single wrongful act—the closing of Wellswood Road—that occurred prior to the injunction action.

Apart from *Gordon*, the plaintiffs have not identified a single case in which a regulation that merely restricted the manner in which land could be developed was deemed to constitute a continuing or recurrent wrong, much less a nuisance. We previously have explained that " '[a] private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land.' 4 Restatement (Second), Torts § 821D (1979); see also *Herbert* v. *Smyth*, 155 Conn. 78, 81, 230 A.2d 235 (1967). . . . 'The essence of a private nuisance is an interference with the use and enjoyment of land.'

W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 87, p. 619." (Citation omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 352, 788 A.2d 496 (2002). Notwithstanding the use of such sweeping terms, our cases involving nuisances almost uniformly have involved physical encroachments or disturbances that were alleged to have interfered with the use and enjoyment of land, such as runoff, odors, and noise. See, e.g., id., 347–48 (odors emanating from dairy farm); *Walsh* v. *Stonington Water Pollution Control Authority*, 250 Conn. 443, 445, 736 A.2d 811 (1999) (odors emanating from sewage treatment plant); *Filisko* v. *Bridgeport Hydraulic Co.*, 176 Conn. 33, 35, 404 A.2d 889 (1978) (runoff from town refuse dump); *Maykut* v. *Plasko*, 170 Conn. 310, 311–12, 365 A.2d 1114 (1976) (use of mechanical noise making device known as a " 'corn cannon' "); *Adams* v. *Vaill*, 158 Conn. 478, 480, 262 A.2d 169 (1969) (noise from " 'unmufflered engines' "); *Herbert* v. *Smyth*, 155 Conn. 78, 82–83, 230 A.2d 235 (1967) (operation of commercial dog kennel, accompanied by incessant barking and howling, as well as "obnoxious odors"); *Gregorio* v. *Naugatuck*, 89 Conn. App. 147, 150, 871 A.2d 1087 (2005) (influx of raw sewage into home).

But, even if the road closure in the present case was properly characterized as a nuisance, the plaintiffs' private nuisance claim would still be barred by res judicata. As the Appellate Court explained in *Rickel* v. *Komaromi*, 144 Conn. App. 775, 73 A.3d 851 (2013), the date on which a nuisance claim accrues depends on whether the nuisance is considered temporary (i.e., continuing) or permanent: "a permanent nuisance claim accrues when injury first occurs or is discovered while a temporary nuisance claim accrues anew upon each injury." (Internal quotation marks omitted.) Id., 787. The Appellate Court further explained that, "[i]f a nuisance is not abatable, it is considered permanent, and a plaintiff is allowed only one cause of action to recover damages for past and future harm. The statute of limitations begins to run against such a claim upon the creation of the nuisance once some portion of the harm becomes observable. . . . A nuisance is deemed not abatable, even if possible to abate, if it is one whose character is such that, from its nature and under the circumstances of its existence, it presumably will continue indefinitely. . . . However, a nuisance is not considered permanent if it is one which can and should be abated. . . . In this situation, every continuance of the nuisance is a fresh nuisance for which a fresh action will lie, and the statute of limitation[s] will begin to run at the time of each continuance of the harm." (Citation omitted; internal quotation marks omitted.) Id., 788.

In reliance on *Rickel*, the plaintiffs in the present case argue that the road closure was a temporary nuisance because the town could have abated it at any time by reopening the road. This argument, however, simply ignores the Appellate Court's analysis in *Rickel* and the

readily distinguishable facts of that case. First, as the Appellate Court explained, not all nuisances that are technically abatable are considered temporary: "if [the nuisance] is one whose character is such that, from its nature and under the circumstances of its existence, it presumably will continue indefinitely," it will not be deemed abatable. (Internal quotation marks omitted.) Id. The closure of the road in the present case, like the passage of an ordinance, is precisely the sort of harm that the plaintiffs were required to presume would "continue indefinitely." (Internal quotation marks omitted.) Id. Unlike the flow of sewage onto one's property or, as in *Rickel*, the repeated incursion of invasive bamboo shoots from a neighboring property, ordinances and resolutions are not harms that necessarily should be abated. To the contrary, we generally presume the propriety of such actions until a requisite showing of impropriety. See *Greater New Haven Property Owners Assn.* v. *New Haven*, 288 Conn. 181, 188, 951 A.2d 551 (2008) ("Every intendment is to be made in favor of the validity of [an] ordinance and it is the duty of the court to sustain the ordinance unless its invalidity is established beyond a reasonable doubt. . . . [T]he court presumes validity and sustains the legislation unless it clearly violates constitutional principles. . . . If there is a reasonable ground for upholding it, courts assume that the legislative body intended to place it [on] that ground and was not motivated by some improper purpose." [Internal quotation marks omitted.]). Accordingly, even if the road closure were properly construed as a nuisance, it would be a permanent one, and the cause of action would have accrued upon the closure of the road.

C

Tortious Interference with Business Expectancies

The plaintiffs further claim that the trial court improperly granted the town's motion for summary judgment on the ground of res judicata as to the plaintiffs' tortious interference with business expectancies claim because there is a genuine issue of material fact as to when that claim accrued. Specifically, the plaintiffs argue that, because an essential element of a claim for tortious interference is that the plaintiffs suffer an "actual loss"; (internal quotation marks omitted) *American Diamond Exchange, Inc.* v. *Alpert*, 302 Conn. 494, 510, 28 A.3d 976 (2011);[15] it was incumbent on the town, for purposes of its motion for summary judgment, to present evidence demonstrating that the plaintiffs sustained losses prior to the commencement of the injunction action. Because the town failed to do so, the plaintiffs argue, the trial court improperly granted its motion for summary judgment with respect to the tortious interference claim. We are not persuaded by the plaintiffs' claim.

This court previously has explained that, with respect to the "ascertainable loss" requirement of a claim under the Connecticut Unfair Trade Practices Act, General

Statutes § 42-110a et seq., "[t]he term loss necessarily encompasses a broader meaning than the term damage, and has been held synonymous with deprivation, detriment and injury. . . . To establish an ascertainable loss, a plaintiff is not required to prove actual damages of a specific dollar amount. . . . [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known." (Citations omitted; internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 287 Conn. 208, 218, 947 A.2d 320 (2008); see also *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 613, 440 A.2d 810 (1981) (" 'Loss' has been held synonymous with deprivation, detriment and injury. . . . It is a generic and relative term. *United States* v. *City National Bank*, 31 F. Supp. 530, 533 [D. Minn. 1939]. 'Damage,' on the other hand, is only a species of loss. Id., 532. The term 'loss' necessarily encompasses a broader meaning than the term 'damage.' " [Citation omitted.]). "Thus, an award of compensatory damages is not necessary to establish a cause of action for tortious interference as long as there is a finding of actual loss . . . ." *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 34, 761 A.2d 1268 (2000); see also *DiNapoli* v. *Cooke*, 43 Conn. App. 419, 428, 682 A.2d 603 (failure to prove money damages did not preclude judgment in favor of plaintiffs on tortious interference claim when trial court found that plaintiffs had proven other losses), cert. denied, 239 Conn. 951, 686 A.2d 124 (1996), cert. denied, 520 U.S. 1213, 117 S. Ct. 1699, 137 L. Ed. 2d 825 (1997).

Applying this definition of loss to the facts of the present case, it is readily apparent that the plaintiffs suffered immediate and cognizable losses as a result of the closure of Wellswood Road, foremost among them the loss of access to their property. In support of their claim for a permanent injunction in *Wellswood I*, the plaintiffs presented expert testimony regarding the diminution in the value of the land that resulted from the town's decision to close the road. The trial court in the present case properly relied on these facts in concluding that the plaintiffs' tortious interference claim could have been brought in *Wellswood I* and, accordingly, properly granted the town's motion for summary judgment with respect to that claim.

D

Whether the Plaintiffs' Claims Should Be Exempt
from the Preclusive Effect of Res Judicata

The plaintiffs finally argue that the policies underlying the doctrine of res judicata, namely, judicial economy, minimization of repetitive litigation, prevention of inconsistent judgments and repose to parties, will not be served by the doctrine's application in the present case. In support of this contention, they maintain, first, that, even if they had brought all of their claims in *Wellswood I*, any damages awarded by the trial court

would have been vacated by this court's reversal of the trial court's judgment, resulting in further proceedings upon remand for a determination of damages for a temporary taking. Thus, according to the plaintiffs, because a new hearing on damages would have been required in *Wellswood I* in any event, allowing this case to proceed would not undermine the policy of judicial economy. The plaintiffs' argument fails to take into account the duration of the proceedings that have occurred in the present case.

To be sure, if the plaintiffs had sought damages in *Wellswood I*, further proceedings would have been required for a determination of just compensation for the period of time that the plaintiffs were deprived of the use of their land, namely, from the date of the road's closure until the date of its reopening following this court's decision in *Wellswood I*.[16] Those proceedings, however, would have concluded seven years ago, thus conserving the considerable resources that the parties and the courts have expended on the present case to date—with no end in sight, if the case were to proceed— and providing repose to the town. Furthermore, as we previously indicated, the issue of damages was extensively litigated in *Wellswood I*, albeit in relation to the issue of irreparable harm. In light of this history, allowing the present case to go forward runs counter to several of the central tenets of res judicata, namely, the minimization of repetitive litigation, the promotion of judicial economy and repose to the parties. We therefore believe that the policies undergirding the doctrine of res judicata strongly support its application in the present case.

The plaintiffs argue nonetheless that it is "inequitable and illogical" for this court to conclude that they should have brought their takings claim in *Wellswood I* because, until this court issued its decision in that case, they had no way of knowing whether the taking would be temporary or permanent, and, therefore, they had no way of knowing the full extent of their damages. The plaintiffs contend, moreover, that applying the doctrine under the facts of this case "would in effect punish [them] for . . . challenging the town's conduct in *Wellswood I*, rather than initially seeking damages." More specifically, the plaintiffs argue that, "[o]nce it became clear in 2005 that the town intended to close Wellswood Road, [they] had two mutually exclusive remedies . . . concede [their] property rights and seek damages for a permanent taking or . . . challenge the town's actions and seek to have the road closure . . . reversed. [They] could not be granted both remedies . . . ."

We have already explained that any uncertainty as to the nature of the takings claim—whether it was for a temporary or permanent taking—did not prevent the plaintiffs from bringing the claim in *Wellswood I*. See

part III A of this opinion; see, e.g., *Chapman Lumber, Inc.* v. *Tager*, supra, 288 Conn. 88. It is beyond argument, moreover, that a plaintiff may request two mutually exclusive forms of relief in a single action. See, e.g., *Dreier* v. *Upjohn* Co., 196 Conn. 242, 245, 492 A.2d 164 (1985) ("[u]nder our pleading practice, a plaintiff is permitted to advance alternative and even inconsistent theories of liability against one or more defendants in a single complaint"); see also Practice Book § 10-25 ("[t]he plaintiff may claim alternative relief, based upon an alternative construction of the cause of action"). In the present case, however, the plaintiffs need not have done so, as they should have sought injunctive relief and damages for a taking, explaining that the scope of those damages would depend on whether the injunction was granted by the court. See *Chapman Lumber, Inc.* v. *Tager*, supra, 88 ("even though it was unclear at the outset of the inverse condemnation action whether the plaintiff's damages claim was for a temporary or complete taking, the claim nevertheless was ripe and capable of resolution on the merits"); see also *Caldwell* v. *United States*, supra, 391 F.3d 1234 ("[i]t is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues"). If the plaintiffs had done so, the trial court might well have bifurcated the trial, addressing the question of damages—whether for a permanent or temporary taking—after resolving the claim for injunctive relief.

We also disagree with the plaintiffs that, if they had brought all of their claims in *Wellswood I* and the trial court had denied their request for a permanent injunction but awarded them damages for a permanent taking, "a substantial question exists as to whether the Connecticut courts would have entertained [their] appellate challenge to the denial of the injunction  . . . ." The plaintiffs cite no authority for this proposition, and we are aware of none. Indeed, it is axiomatic that a party may appeal from a final adverse determination of the trial court and that the award of some relief does not mean that a party is not aggrieved by the trial court's decision. See, e.g., *In re Allison G.*, 276 Conn. 146, 158, 883 A.2d 1226 (2005) ("[a] prevailing party . . . can be aggrieved . . . if the relief awarded to that party falls short of the relief sought" [internal quotation marks omitted]). Although it is true that, "as a general proposition, when a litigant asks for one form of relief *or* another, the litigant is not aggrieved by an order providing at least one of the requested forms of relief"; (emphasis altered) *Seymour* v. *Seymour*, 262 Conn. 107, 112–13, 809 A.2d 1114 (2002); that does not mean that a plaintiff is not aggrieved by an order denying relief that was *not* requested in the alternative, such as a request for damages *and* an injunction. Thus, in the present case, the plaintiffs should have sought both injunctive relief and damages in *Wellswood I*, with the

scope of those damages to be determined upon the resolution of the claim for injunctive relief.

In sum, we are not persuaded that the plaintiffs have identified a sufficiently compelling reason to exempt their claims from the preclusive effect of res judicata. We therefore reject their claim that the trial court improperly granted the town's motion for summary judgment.

The judgment is affirmed.

In this opinion the other justices concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] The town's Board of Selectmen and Jared Clark, the town manager, were also defendants in *Wellswood I*. In the present action, however, the town is the sole defendant.

[2] The plaintiffs appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] Because the trial court concluded that the plaintiffs' claims were barred by res judicata, it did not reach the town's claims that they were also barred by the applicable statutes of limitations or, in the case of the tortious interference claim, by governmental immunity. Because we also conclude that the plaintiffs' claims are barred by res judicata, we also do not reach the town's alternative grounds for affirmance.

[4] For purposes of clarity, in this portion of the opinion, we refer to the town by name.

[5] As this court repeatedly has stated, "[a] party seeking injunctive relief must demonstrate that: (1) it has no adequate remedy at law; (2) it will suffer irreparable harm absent an injunction; (3) it will likely prevail on the merits; and (4) the balance of equities tips in its favor." *Aqleh* v. *Cadlerock Joint Venture II, L.P.*, 299 Conn. 84, 97, 10 A.3d 498 (2010).

[6] In concluding that the plaintiffs had failed to prove a total and permanent loss of the right of access to public roads, the trial court stated: "In the present case, it remains to be seen whether proposals with alternative means of access would be acceptable to Columbia authorities, but the fact remains that access through Columbia would be possible in the future and the plaintiffs themselves embrace that model of planning. Because the plaintiffs have failed to establish that [the town's] actions would actually landlock their proposed development, they have not satisfied their burden of proving that they would suffer irreparable harm if an injunction is not granted. The fact that the plaintiffs will have to access their property through more [time consuming] and expensive means than they would if [the town] was forced to keep Wellswood Road open to their development does not mean that irreparable harm will result." *Wellswood Columbia, LLC* v. *Hebron*, supra, 46 Conn. L. Rptr. 74.

[7] "[I]n order to recover damages in a common-law private nuisance cause of action, a plaintiff must show that the defendant's conduct was the proximate cause of an unreasonable interference with the plaintiff's use and enjoyment of his or her property. The interference may be either intentional . . . or the result of the defendant's negligence." (Citation omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 361, 788 A.2d 496 (2002). As we explain more fully hereinafter, whether the private nuisance is deemed temporary or permanent determines the point at which the claim accrues. See part III B of this opinion; see also *Rickel* v. *Komaromi*, 144 Conn. App. 775, 788, 73 A.3d 851 (2013).

[8] Section 26 (1) (e) of the Restatement (Second) of Judgments provides: "When any of the following circumstances exists, the general rule of [res judicata] does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant: . . . For reasons of substantive policy in a case involving a continuing or recurrent wrong, the plaintiff is given an option to [recover] once for the total harm, both past and prospective, or to [commence an action] from time to time for the damages incurred to the date of [the action], and chooses the latter course . . . ." 1 Restatement (Second), supra, § 26 (1) (e), p. 234.

[9] Because the plaintiffs challenge the trial court's decision to grant the

town's motion for summary judgment, our review of that decision is also guided by the general principles governing such motions. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing . . . that the party is . . . entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Powell* v. *Infinity Ins. Co.*, supra, 282 Conn. 599–600.

[10] See, e.g., *Miller* v. *Westport*, 268 Conn. 207, 214, 842 A.2d 558 (2004) ("when municipal land use regulations result in taking, owner [is] entitled to temporary takings damages for period that use of land was denied until taking ends"); see also *Whitehead Oil Co.* v. *Lincoln*, 245 Neb. 680, 697, 515 N.W.2d 401 (1994) (upholding trial court's decision that temporary taking had occurred but remanding for recalculation of damages to compensate for additional damages that accrued during pendency of appeal).

[11] The court in *New Port Largo, Inc.*, did not overrule *Corn*, however, as the concurring opinions explained, inter alia, that only an en banc panel of that court can overrule a prior panel's holdings and that, in any event, it was unnecessary to review *Corn* en banc because the result would be the same regardless of what standard the court applied. *New Port Largo, Inc.* v. *Monroe County*, supra, 985 F.2d 1495 n.1 (Tjoflat, C. J., concurring); see also id., 1501 n.8 (Edmondson, J., concurring) (explaining that rehearing en banc was not warranted because such rehearings "are costly, time-consuming affairs for litigants and for the court as an institution").

[12] See, e.g., *Algonquin Heights Associates L.P.* v. *United States*, 100 Fed. Cl. 792, 797 (2011) ("[T]he Federal Circuit's discussion [in *Creppel*] of when the temporary takings claim accrued was not essential to its disposition of that claim. It therefore carries no binding effect.").

[13] We note that the opinion in *Creppel* cites a single case, namely, *First English Evangelical Lutheran Church* v. *Los Angeles*, 482 U.S. 304, 321–22, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987), for the proposition that a temporary regulatory taking does not accrue until the taking ceases. Nothing that the United States Supreme Court stated in that case, however, can reasonably be construed as supporting that proposition. In *First English Evangelical Lutheran Church*, the court "merely [held] that [when] the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." Id., 321.

[14] "The continuing violations doctrine is an equitable exception to a strict application of a statute of limitations where the conduct complained of consists of a pattern that has only become cognizable as illegal over time. . . . [W]hen a defendant's conduct is part of a continuing practice, an action is timely [as] long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." (Citations omitted; internal quotation marks omitted.) *Foster* v. *Morris*, 208 Fed. Appx. 174, 177–78 (3d Cir. 2006).

[15] "[T]he elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." (Internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, supra, 302 Conn. 510.

[16] Once a taking has been classified as either temporary or permanent, the trial court must determine just compensation for the period of the taking. See, e.g., *First English Evangelical Lutheran Church* v. *Los Angeles*, supra, 482 U.S. 322 (in temporary takings case, government must compensate landowner for effective period of ordinance prior to its invalidation by courts); *Miller* v. *Westport*, supra, 268 Conn. 214 ("when municipal land use regulations result in [a] taking, [the] owner [is] entitled to temporary takings damages for [the] period that [the] use of [the] land was denied until [the] taking ends"); see also *Ladd* v. *United States*, 110 Fed. Cl. 10, 13 (2013) ("The beginning and ending dates of a temporary taking establish due compensation to the landowners. Compensation is the difference between the before and after-appraised values . . . applied to the length of time landowners were deprived of their reversionary interests."). As we noted pre-

viously, the period of an unlawful taking for which compensation must be paid includes the period of time that the landowner was deprived of his or her use of the property during the pendency of any appeal. See footnote 10 of this opinion.

_____